THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR MORALES *et al.*, Defendants-Appellants.

Second District   Nos. 2—92—0098, 2—92—0154 cons.

Opinion filed November 9, 1993.

G. Joseph Weller, Paul Alexander Rogers, and Thomas A. Lilien, all of State Appellate Defender's Office, of Elgin, for appellants.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

Defendants, Victor Morales and Francisco Aguirre, appeal from their convictions in the circuit court of Lake County of aggravated battery, causing great bodily harm (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(a) (now codified, as amended, at 720 ILCS 5/12—4(a) (West 1992))). Defendant Aguirre also appeals from the trial court's imposition of the maximum extended term of 10 years.

Defendants argue on appeal that the State's evidence was insufficient to prove guilt beyond a reasonable doubt and that defendants were unfairly surprised by the complainant's testimony because the

State failed to supply them with notice of it in the discovery materials. Defendant Aguirre further argues that the trial court improperly admitted evidence regarding his alleged role as the chief of the Latin Lovers, a Waukegan street gang, and that two of the extended-term factors considered by the trial court are unconstitutional. We affirm.

On August 16, 1991, defendants were charged by information with two counts of aggravated battery. Each defendant retained his own counsel. On August 28, the Lake County grand jury returned a three-count indictment supplanting the complaint. The indictment charged the two defendants, along with Roberto Dominguez and Carlos Cortez, with the commission of offenses against Keith Smith on August 15, 1991. The counts charged in the indictment were attempted murder, aggravated battery (great bodily harm form), and aggravated battery (public way form).

Dominguez pleaded guilty to a charge of aggravated battery and has a separate appeal pending before this court (No. 2—92—0429). Cortez was not apprehended.

The cause proceeded to a joint bench trial on December 9, 1991. Both defendants moved for an examination of Smith's competency before he testified, based on his having sustained brain damage and his lacking recollection. The motion was denied as not sufficiently raising a question of competency to require a hearing in advance of the witness testifying. The trial court directed a finding for defendants on the attempted murder count and acquitted them on the count of aggravated battery involving public property. The court convicted each defendant of the count of aggravated battery causing great bodily harm.

Aguirre filed a motion to reconsider and for a new trial. Morales also filed a motion for a new trial. On January 17, 1992, the court sentenced Morales to a term of 4½% years' imprisonment and Aguirre to an extended term of 10 years' imprisonment. Aguirre's motion to reconsider the sentence was denied. Both defendants timely appealed, and their appeals were consolidated by this court.

Accounts of the events of August 15, 1991, vary considerably. All of the witnesses concur, however, that, after dark that evening, Keith Smith entered Yeoman Park with several fellow members of the Latin Lovers, including Morales, Aguirre, Dominguez, and Cortez, where he underwent a three-minute "violation," or beating, in order to be released from membership in the gang. Smith fell unconscious during the beating and was subsequently taken to St. Therese Hospital in the truck of another gang member, Jacid Prado.

The parties stipulated to the testimony of Dr. Avilla of St. Therese Hospital, as reflected in his medical reports. Dr. Avilla examined Smith on August 16 and thereafter and performed a craniotomy. According to medical reports, Smith suffered from an acute subdural hematoma on the left side, multiple facial injuries, and blunt trauma to the abdomen with hematuria. He was transported from the hospital to the Rehabilitation Institute of Chicago on September 9, 1991. He was released from the institute on November 14, 1991, and at the time of trial was attending a rehab program on a daily basis from 8 a.m. to 4 p.m.

Witnesses called by the State included several members of the Latin Lovers gang. Keith Smith, the complainant, was 15 years old at the time of the incident and stated that he had been a member of the Latin Lovers for about eight months. Jacid Prado, who described himself as a close friend of Smith, was a member of the gang for 8 to 12 months before August 15, 1991, and got Smith a job with his father's construction company. Felipe Diaz, 20 years old at the time of trial, testified that he had been in the Latin Lovers for three years, had been chief of the gang three months prior to August 15, 1991, but had gotten out by the time of trial. Diaz testified before the grand jury on August 28, 1991, in exchange for the State's promise not to prosecute him for the offenses against Smith.

The State also called 16-year-old Jose Olivero, who testified that he was a friend of Smith and not a member of any gang on August 15, 1991; 17-year-old Jose Medina, who, after beginning his testimony by denying ever being a gang member, admitted on cross-examination to being in the Satan's Disciples, an allied gang of the Latin Lovers; Officer Hendley, a Waukegan police officer; and Lolita Torrez, Morales' fiancee.

Each defendant called one witness. Morales called Officer Hendley and Aguirre called Roberto Dominguez. Dominguez had been a member of the Latin Lovers for a year as of the time of trial and was in jail awaiting sentencing, having pleaded guilty to aggravated battery. Dominguez testified that only he and Cortez inflicted the beating on Smith.

The significant differences in testimony revolve around precisely who was present before, during, and after Smith was "violated"; what were the rules and protocol of a violation; who was the chief of the Latin Lovers on August 15, 1991; and what role Morales and Aguirre may have played in the incident. The chronology of the events is generally agreed upon.

Around 9 or 10 p.m. on August 15, Smith and his friend Jose Olivero were walking near Yeoman Park when they were approached by Aguirre, Morales, Dominguez, Cortez, and Diaz. Diaz testified that he was riding a bicycle alone on August 15 when he came upon Smith and the others and that individuals called "Face" and "Oh Boy," whom Diaz identified as the leader of the Satan's Disciples, were also present, along with "a couple of the other gang members." Diaz also stated that Smith was in the company of members of a gang called the Last Deeds.

According to Smith, the Yeoman Park area was in the territory of the Satan's Disciples. Smith testified that he wanted to leave the Latin Lovers and had spoken about joining the Satan's Disciples, although he did not really want to go to another gang. Jacid Prado testified that the Latin Lovers had a rule against not hanging around with the members. He stated that both he and Smith, who saw each other daily, stopped spending time with fellow gang members prior to August 15, 1991. Dominguez also testified that Smith had stopped hanging around with the gang for some time before August 15. Prado said he was warned prior to August 15 that members were going to beat up those who did not hang around with the gang.

Initiation into the gang required undergoing a one-minute violation, which evidently consisted of fighting one, two, or three members of the gang for one minute and did not include contact with the face. Getting out of the gang required undergoing a three-minute violation, which, by all but one witness' account, meant fighting with three members for three minutes. Dominguez offered the conflicting testimony, stating that the number of members administering the beating for leaving the gang was the same as for entering: "[i]t can be 1, it can be 10." Use of the hands and the feet was permitted, as well as contact from head to toe, including the face.

Smith testified that he had witnessed "maybe about two" violations as a member of the gang. Diaz testified that the gang instituted the rule requiring a three-minute beating to get out of the gang one month prior to August 15. Although Diaz said he had witnessed four or five one-minute violations, his statements are ambiguous as to whether the August 15 violation of Smith was the first three-minute violation he had personally witnessed or the first that the Latin Lovers had attempted.

According to Smith, Aguirre was chief of the Latin Lovers throughout the eight months Smith was a member. Smith stated that in the prior violations he had witnessed Aguirre named the three persons who would take part; he did not hear anyone name who the

three violators would be on August 15. Diaz testified that he was chief until three months before Smith's violation, but that Aguirre was chief on August 15. Diaz stated that the chief decided who would administer the one-minute violations he had observed. Dominguez testified that Diaz was chief on August 15 and that Diaz designated who the violators would be. Prado testified that Diaz was never chief during the 8 to 12 months that Prado was a member; rather, Aguirre was chief.

When Smith and Olivero encountered Aguirre, Morales, and the others near Yeoman Park, Smith was asked whether he wanted to get out of the gang. Smith replied that he did and, according to Diaz, that he wanted to move on to the Satan's Disciples. According to Olivero and Diaz, Aguirre then told Smith that he would have to take his violation to get out. Smith testified that, although he realized he had to undergo a violation in order to leave the gang, he wanted it one-on-one but that Aguirre replied it had to be his way: Smith had to fight three men for three minutes. According to Olivero, Smith also stated that he did not want the violation done that night, but Aguirre said that he could "get it now" or "whenever they see him."

Smith testified that he agreed to take his violation, although he did not want to do so at any time. Aguirre, Morales, Dominguez, Cortez, Diaz, Olivero, and Smith then proceeded to the park. Either before entering the park or after, Smith went to get a watch so that the three-minute violation could be timed. Diaz testified that, as they walked to the park, Aguirre asked him if he "wanted some exercise," and Diaz replied that he did not. Diaz stopped across the street from the park and remained there on his bike; he estimated he was 50 or 60 feet from a ditch or ravine that the others entered. Olivero testified that he stopped some 70 feet from where the fight occurred.

The violation took place down a hill in the park, in a ditch. Morales, Aguirre, Cortez, and Dominguez were present in the ditch. According to Diaz, "Face," a member of the Satan's Disciples, was also there as an observer and timekeeper. Dominguez stated that a member of the Satan's Disciples named "Rat" entered the ditch to keep time and that Morales and "Jose" also entered the ditch but stood 10 feet from the fight. According to Smith, it was Aguirre who kept the time. By all accounts, Aguirre stood up the hill from the ditch by some trees, 20 or 25 feet from the others.

Smith testified that Morales threw the first punch, followed by the other two violators, Dominguez and Cortez. He stated that he fought back for awhile but then "got hit with a blunt, blunt object" and "went into a coma." He had no further recollection of what oc-

curred. Diaz testified that he could see and hear nothing from his position across the street. Olivero stated that he could make out "shadows" moving in the ditch and could hear "punches and kicks" and "a little bit of yelling." Dominguez testified that he and Cortez administered the beating by kicking and punching Smith.

Olivero testified that he could see that Smith fell to the ground after about 30 seconds. At the two-minute point, Olivero heard someone say, "[s]top because he looks like he's dead." Olivero started toward the ditch when he heard a voice he thought was Aguirre's say, "[t]he 3 minutes are not up" and "[k]eep on going." Twenty to thirty seconds of further activity in the ditch ensued before Olivero heard someone say "[t]hat he was just badly hurt." Olivero then went into the ditch.

Dominguez testified that after he and Cortez beat Smith for two minutes, they stopped to let him get up. Dominguez did not recall anyone saying "I think he's dead" but stated that Smith did not get up. He and Cortez then beat Smith for another minute after the timekeeper said the time was not up.

Olivero testified that Smith lay on the ground in the ditch, mumbling; he appeared stiff and felt cold. Morales, Dominguez, Cortez, Aguirre, and "Face," whom Olivero had not seen enter the park or the ditch, stood about five feet from Smith. According to Olivero, Dominguez and Cortez had their shirts off. Olivero tried to get Smith to respond or get up, but Smith would not do so. Olivero testified that someone, perhaps Oswaldo Perez, "came back" with some warm water and threw it on Smith. Olivero then went to a nearby home and got some cold water to splash on Smith. After Smith failed to respond, someone said, "Call an ambulance." Morales said not to do so because they might get arrested. By this time, Diaz, whom Olivero had seen earlier on a bicycle on the street, had joined the others in the ditch.

Diaz testified that 15 or 20 minutes after the others entered the ditch Morales, Dominguez, and Cortez walked up out of the ditch, and Diaz went over to them and Aguirre. According to Diaz, "Face" came up after the others and told Diaz to go get Smith some water. Diaz could see Smith lying on the ground. He went to a nearby alley and got water from some Satan's Disciples partying there. About 20 minutes after the men came out of the ditch, Jacid Prado arrived at the park.

Prado testified that he and Smith had worked together until 6 p.m. and then rode around together until 8:30 p.m. Prado dropped Smith off near Yeoman Park and went to see his girlfriend. Around

10:30 p.m., Prado went looking for Smith. He encountered Jose Medina, who told him that Smith had been hurt. The two drove in Prado's truck to Yeoman Park, where they were approached by Aguirre, Morales, Cortez, Dominguez, and Diaz. Prado got back in his truck. A few of the gang members were in front of the truck, a few in back. Cortez had his shirt off and was hitting his back to cool off. Aguirre came to the door and told Prado to get out of the truck to talk. Prado got out and said, "What do you guys want?" Aguirre responded, "What do you mean what do we want?" The others then started arguing with Prado and telling him he was going to get his "ass kicked."

According to Prado, Diaz said, "Do you want to get out? Do you want to get out? Do you want to get your beating right now?" Prado testified that it was Aguirre who told him Smith was hurt and that Prado was to get hurt like that, too. Diaz testified that "a couple of other guys" were also there, including "Rat." Diaz stated that he told Prado "that he'd get out the same way Keith had gotten out" and that "Keith had already got his, he ain't shit any more, he got his, and he isn't one of us." According to Diaz, Morales and Dominguez also told Prado that he would get out the same way Keith had gotten out.

Jose Medina, who stated that he did not know Aguirre or Diaz, testified on direct examination that Aguirre asked Prado "[i]f he wanted to get it done with." On cross-examination, he stated that Diaz told Prado that "he was going to get the same thing that Keith got." He also acknowledged that the latter statement was consistent with his testimony before the grand jury.

According to Prado, Aguirre at this point told the others to shut up, grabbed Prado, said he wanted to talk, and escorted him a few steps in front of the truck. Diaz testified that Aguirre pulled Prado aside and talked to him but that he could not hear the conversation. Prado testified that he told Aguirre that he did not want to be a part of the gang anymore. Questioning about what Aguirre said was not permitted by the trial court upon defense counsel's objection.

Prado stated that he asked Aguirre where Smith was. Someone was screaming that Smith was hurt and would not wake up. Prado then ran to the ditch and knelt next to Smith, who was shaking and having difficulty breathing. Prado asked how long Smith had been there and was told "45 minutes." Prado put Smith in his truck; others including Medina and Olivero jumped in. Prado then took Smith to St. Therese Hospital.

Olivero testified that Smith lay in the ditch for 30 to 45 minutes before being taken to the hospital. He also stated that he got Prado to assist him in carrying Smith to the truck. Medina testified that Olivero and Diaz got Smith, who was bruised and wet, and put him in the back of the truck. According to Medina, he, Olivero, and Olivero's "brother Perez" rode along to the hospital. Diaz testified that those taking Smith to the hospital were told to say that they had found him on the street and that "he had got jumped by a rival gang."

Diaz testified that, after Smith was taken to the hospital, Diaz rode his bicycle to a friend's house and then ended up at a birthday party for Cortez. Aguirre, Morales, and Dominguez were present.

Officer Hendley testified that Morales told him he was not at Yeoman Park the night of August 15, 1991. Lolita Torrez, Morales' fiancee, testified that Morales was not, as he had claimed to Officer Hendley, at their home during the hours that the incident occurred that evening. Called by the defense, Officer Hendley also testified that when he spoke with Smith on November 15, 1991, Smith recalled only that he had gone for a ride with Prado to get his truck repaired and had no recollection of how he had been injured.

The first issue raised by defendants on appeal is whether the State's evidence failed to prove either defendant guilty beyond a reasonable doubt under the theory of accountability. Defendants challenge the credibility of Smith's testimony, asserting that Smith had sustained serious brain damage and had clearly been coached. Defendants maintain that, even allowing Smith's testimony, the State's evidence is insufficient either to prove defendants' direct participation in the aggravated battery or to establish the elements of accountability.

When an appellate court reviews the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89; *People v. Irby* (1992), 237 Ill. App. 3d 38, 57.) A reviewing court cannot overturn a guilty verdict unless the proof is so unsatisfactory and unconvincing that it raises a serious doubt of defendant's guilt in light of all the evidence. *People v. Szudy* (1982), 108 Ill. App. 3d 599, 605; see also *People v. Coulson* (1958), 13 Ill. 2d 290, 296; *People v. Bennett* (1991), 222 Ill. App. 3d 188, 196.

■ We note initially that, contrary to the State's assertion, the issue of Smith's competency was properly raised below by motions filed

before he testified and in Morales' motion for a new trial. The questions of competency and credibility were argued by defendants' attorneys, and the trial court made specific findings. We find that the issue of Smith's competency to testify is not waived.

The trial court found Smith competent to testify and found his testimony credible. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the credibility of the witnesses. (*People v. Snulligan* (1990), 204 Ill. App. 3d 110, 118.) After hearing arguments, the trial court stated its finding that the victim had no problem understanding questions and that there were "[n]o indications of [a] lack of competency to testify." Although the trial court found that the victim's comment about being hit with a "blunt object" made no sense, the court found the rest of the victim's testimony "very, very credible."

We do not agree with defendants that Smith's use of the "blunt object" language clearly indicates coaching. The opposite conclusion might as readily be reached, since it is logical to presume that a witness who is a layperson would not be instructed to use terminology that lay people do not use. Moreover, the trial court stated, "I don't think that [Smith's testimony] was made up. I don't think it was imposed by other persons." We decline to disturb the trial court's judgment as to the competency and credibility of Smith's testimony.

Two other matters of credibility need to be addressed. First, defense witness Dominguez was found by the trial court to be unbelievable, "a very polished liar." It was Dominguez who stated that only he and Cortez administered the violation and that they did so at the direction of Diaz, who, according to Dominguez, was the chief of the gang. Secondly, we agree with defendants' characterization of State's witness Diaz as an accomplice witness, and, accordingly, we scrutinize with caution any uncorroborated testimony. (See *People v. Ash* (1984), 102 Ill. 2d 485.) Moreover, Diaz's testimony carries with it the inherent weakness of his promise not to be prosecuted and should not be accepted unless it carries with it an absolute conviction of truth. *Ash*, 102 Ill. 2d at 493; *People v. Gnat* (1988), 166 Ill. App. 3d 107, 110.

To convict a person of an offense on a theory of accountability, the State must prove beyond a reasonable doubt that: (1) the defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) this participation took place either before or during the commission of the offense; and (3) the defendant had the concurrent, specific intent to promote or facilitate the commission of the offense. Ill. Rev. Stat. 1991, ch. 38, par.

5—2(c) (now 720 ILCS 5/5—2(c) (West 1992)); *People v. Taylor* (1991), 219 Ill. App. 3d 47, 49.

While mere presence at the scene of a crime does not render an accused accountable for the offense (*People v. Johnson* (1991), 220 Ill. App. 3d 550, 554), active participation is not a requirement for imposing liability under a theory of accountability (*People v. Reid* (1990), 136 Ill. 2d 27, 61). The factors to be considered in determining a defendant's legal accountability include the accused's presence during the commission of the crime without opposing or disapproving it, the accused's failure to report the crime, and the accused's continued association with the perpetrator or perpetrators after the criminal act. *People v. Grice* (1980), 87 Ill. App. 3d 718, 725; see also *People v. Walker* (1992), 230 Ill. App. 3d 377, 388.

■ We believe that the State's evidence is sufficient to prove defendants guilty beyond a reasonable doubt under the theory of accountability. Although the testimony varies as to the details of the procedure, it is not disputed that the Latin Lovers intended to "violate" those members wishing to leave the gang. There is no question that Smith was beaten and sustained great bodily harm on August 15, 1991. It is also undisputed that both Morales and Aguirre were present during the commission of the beating. The trial testimony consistently places Morales in the ditch during the violation and Aguirre some 20 to 25 feet away. There is no evidence that either defendant opposed or disapproved of the beating, and neither of them reported the incident. The evidence suggests that defendants continued to associate with at least one of the perpetrators after the act. Diaz testified that, following the events in the park, Morales and Aguirre went to a party for Cortez and that Dominguez, who pleaded guilty to being a perpetrator, was also there. The record further indicates that Dominguez was still a member of the Latin Lovers at the time of trial and that neither defendant had given up his own gang membership before the trial began.

We agree with the trial court that Smith's statement that Morales threw the first punch is direct evidence of Morales' participation in the commission of the offense, whether or not that swing actually caused bodily harm. We also agree that Smith's testimony, corroborated in varying degrees by that of Olivero, Prado and Diaz, sufficiently established that Aguirre was in charge of the events on August 15, and, accordingly, that he aided, abetted and facilitated the planning and commission of the offense.

For the above reasons, we affirm the trial court's finding that each defendant committed the offense of aggravated battery based on the theory of accountability.

The next issue defendants raise on appeal is whether they were unfairly surprised by Smith's testimony in contravention of the rules of discovery (see 134 Ill. 2d Rules 412(a)(i), (a)(ii), 415(b)). Specifically, defendants contend that they should be granted a new trial because they had no notice in the discovery materials that Smith would remember damaging details against each defendant with respect to the ultimate issue of accountability.

The State counters by arguing that the prosecution provided defense attorneys with as much information as it could as soon as it was possible and that it did not know exactly how much Smith would recall at trial. The State also argues that Smith's testimony was similar to that of Diaz and Olivero and, moreover, that the issue is waived.

■ We agree with the State that the issue of possible discovery violations with respect to Smith's testimony is waived. An assertion of unfair surprise is waived by failing to object (*People v. Zarebski* (1989), 186 Ill. App. 3d 285, 291) and by failing to request a continuance or otherwise to develop the record (*People v. Walls* (1992), 224 Ill. App. 3d 885, 897; *People v. Jastrzemski* (1990), 196 Ill. App. 3d 1037, 1041). Defendants challenged the victim's competency to testify but did not claim that they were surprised or needed a continuance to investigate further. As the trial court stated at the post-trial motion hearing, there was no motion for mistrial, nor were there any allegations of prejudice. Defendants did not raise the issue of late modifications of discovery until the filing of their motions for a new trial.

Defendants assert that the failure to seek a continuance should not preclude them from relief because the evidence is closely balanced. Defendants cite *People v. Weaver* (1982), 92 Ill. 2d 545, in which the supreme court recognized reversible error in part because the case was a close one. Alternatively, defendants urge that we apply the plain error exception to the waiver rule (see 134 Ill. 2d R. 615(a)). The plain error doctrine is applicable when the evidence is so closely balanced that the verdict may have resulted from the alleged error. (*People v. Musitief* (1990), 201 Ill. App. 3d 872, 879.) However, we do not perceive the evidence in this case to be close and, therefore, decline to follow the example of *Weaver* or to apply the plain error doctrine.

The next issue raised on appeal is defendant Aguirre's contention that the trial court abused its discretion in admitting testimony of Aguirre's involvement in the Latin Lovers. Specifically, Aguirre main-

tains that the trial court erred by admitting the testimony of Smith and Diaz that he, as chief of the gang, ordered violations and selected the participants on previous occasions, where an adequate foundation to show habit or routine practice or otherwise justify admission was lacking.

■ We agree with the State that this issue is also waived. Both a trial objection and a written post-trial motion raising an issue are necessary, in both jury and nonjury cases, in order to preserve an alleged error for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-88.) Although several objections were offered below to the testimony of Diaz and Smith about prior gang "violations," Aguirre's motion for a new trial does not mention the issue of improperly admitted evidence.

Aguirre contends that the issue is raised in Morales' motion for a new trial. Morales' motion states that "the court erred in allowing testimony of customs and usage of the Latin Lover Street Gang over objection of the Defendant." It is arguable whether that allegation raises the precise issue before us sufficiently to have afforded the trial court full opportunity to consider it, since it does not specify that foundational requirements were not met. However, we do not need to decide that question because the issue as raised on appeal has no bearing on Morales, only on Aguirre. The record does not indicate that either defendant intended to adopt the other's post-trial motion, and Aguirre does not advance that argument on appeal. Aguirre's statement that the issue should be considered adequately preserved is not backed by citation to legal authority.

We are again urged to apply the plain error exception to the waiver rule on the ground that the evidence is closely balanced, and again we decline. The case cited by Aguirre, *People v. Smith* (1990), 141 Ill. 2d 40, is distinguishable from the case before us. In *Smith*, which was tried before a jury, the supreme court was concerned that the weight which the jury attributed to a witness' testimony may have been influenced by other evidence alleged to have been incompetent. (*Smith*, 141 Ill. 2d at 55.) Here, we are dealing with a bench trial, and the trial court specifically stated at the hearing on defendants' post-trial motions that it did not consider the evidence it admitted about gang habits to be particularly significant.

Finally, defendant Aguirre raises constitutional objections to two of the factors in aggravation considered by the trial court in imposing the maximum extended-term sentence of 10 years' imprisonment. The State argues that Aguirre waived these issues because he failed to object at the sentencing hearing and failed to raise the issues in his motion to reconsider sentencing. However, our supreme court has deter-

mined that a challenge to the constitutionality of a statute can be raised at any time. *People v. Bryant* (1989), 128 Ill. 2d 448, 454.

Aguirre first challenges section 5—5—3.2(b)(2) (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(b)(2) (now codified, as amended, at 730 ILCS 5/5—5—3.2(b)(2) (West 1992))) as being unconstitutionally vague. That section states that the court may impose an extended-term sentence when "the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(b)(2) (now codified, as amended, at 730 ILCS 5/5—5—3.2(b)(2) (West 1992)).

■ We find that defendant's claim is without merit. As defendant concedes, the statutory language "exceptionally brutal and heinous behavior indicative of wanton cruelty" has been upheld against a vagueness challenge, and we see no reason to disturb our previous holding.

In *People v. Hernandez* (1990), 204 Ill. App. 3d 732, this court reiterated that, in the absence of a proportionality challenge to a term-of-years sentence, an eighth amendment vagueness analysis applies only in death penalty cases and does not apply to an extended term of imprisonment. (*Hernandez*, 204 Ill. App. 3d at 744; *People v. Brown* (1990), 195 Ill. App. 3d 78, 89.) Defendant does not claim on appeal that his term-of-years sentence, which is within statutory limits, is disproportionate to his offense; rather, he argues only that the statute itself is unconstitutional in that it creates the possibility that extended-term sentences under it could be capriciously and arbitrarily imposed. See generally *Brown*, 195 Ill. App. 3d at 89-90; *People v. Peeples* (1989), 184 Ill. App. 3d 206, 211.

Defendant asserts that the Illinois courts must give a limiting construction to save section 5—5—3.2(b)(2) from a vagueness challenge. We believe that sufficiently limiting construction has been given. In *People v. Andrews* (1989), 132 Ill. 2d 451, the supreme court observed that the word "exceptionally" serves to restrict the terms "brutal or heinous" and went on to state that the extended-term sentencing statute " 'was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence.' " *Andrews*, 132 Ill. 2d at 466, quoting *People v. Evans* (1981), 87 Ill. 2d 77, 88-89.

In *People v. Pirrello* (1991), 207 Ill. App. 3d 208, this court confirmed the supreme court's determinations and further stated that the concept announced in *Andrews* did not involve new law. (*Pirrello*, 207 Ill. App. 3d at 216.) Moreover, in *Brown*, we concluded that the extended-term statute was not unconstitutionally vague because it required not only that the offense be exceptionally brutal or heinous,

but that it be "indicative of wanton cruelty" as well. *Brown*, 195 Ill. App. 3d at 91; see also *Peeples*, 184 Ill. App. 3d at 212.

In his reply brief, defendant urges that his sentence should be reconsidered by the trial court in light of *People v. Lindsay* (1993), 247 Ill. App. 3d 518, a case decided by this court after defendant was sentenced. Defendant maintains that our opinion in *Lindsay* "mandates" a narrower construction of section 5—5—3.2(b)(2) than was in effect when defendant was sentenced. We do not agree.

We believe our analysis and holding in *Lindsay* only confirm our previous determinations that section 5—5—3.2(b)(2) is not unconstitutionally vague. In *Lindsay*, we examined whether a finding of exceptionally brutal or heinous behavior was foreclosed in a case where the defendant had been convicted of second-degree murder based on an unreasonable belief in the need for self-defense. We held that no *per se* rule existed but that the evidence before us was insufficient to show that defendant's crime was accompanied by exceptionally brutal and heinous conduct.

In the course of our analysis, we reemphasized the importance of the word "exceptionally" and repeated the supreme court's admonishment, quoted above, that extended-term sentencing was not intended to enhance the punishment for every offense. We further observed that "[t]he stringency of this standard accounts for the *extraordinary readiness* with which courts of review have *in recent years* found that trial courts abused their discretion in imposing extended-term sentences on this ground [of section 5—5—3.2(b)(2)]." (Emphasis added.) (*Lindsay*, 247 Ill. App. 3d at 531-32.) The cases we cited to support this statement were decided before defendant was sentenced and demonstrate, we believe, an application of the exceptionally brutal or heinous standard comparably stringent to our application in *Lindsay*. See *People v. Andrews* (1989), 132 Ill. 2d 451, 464; *People v. Curtis* (1990), 207 Ill. App. 3d 628; *People v. Fields* (1990), 198 Ill. App. 3d 438, 442-45; *People v. Bedony* (1988), 173 Ill. App. 3d 613, 620-22; *People v. Price* (1987), 158 Ill. App. 3d 921, 929-30; *People v. Gil* (1987), 155 Ill. App. 3d 436, 439.

We find that *Lindsay* does not cast doubt upon the constitutionality of section 5—5—3.2(b)(2) at the time defendant was sentenced, and we hold, therefore, that defendant is not entitled to a resentencing hearing.

Aguirre also challenges section 5—5—3.2(b)(6) (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(b)(6) (now codified, as amended, at 730 ILCS 5/5—5—3.2(b)(6) (West 1992))), which provides that the court

may consider the following factor as a reason to impose an extended-term sentence:

"When a defendant is convicted of any felony and the offense involved any of the following types of specific misconduct committed as part of a ceremony, rite, initiation, observance, performance, practice or activity of any actual or ostensible religious, fraternal, or social group:

(i) the brutalizing or torturing of humans or animals."

Aguirre maintains that this extended-term factor is unconstitutionally irrational since it does not allow for the consent of the person harmed and thereby conflicts with the treatment of consent as a defense and mitigating factor in Illinois law.

■ We are not persuaded that such a conflict exists. Section 5—5—3.2(b)(6) is one of the factors in aggravation that a court may consider when determining whether to impose an extended-term sentence. Factors to be considered in mitigation are listed in section 5—5—3.1. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.1 (now 730 ILCS 5/5—5—3.1 (West 1992)).) One potentially mitigating factor is whether "there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.1(a)(4) (now 730 ILCS 5/5—5—3.1(a)(4) (West 1992)).) Defendant contends that this section provides for raising consent as a mitigating factor at sentencing. Assuming, without deciding, that defendant's interpretation is correct, section 5—5—3.1(a)(4) provides the opportunity to introduce consent of the victim, thus countervailing the aggravating factor set forth in section 5—5—3.2(b)(6).

Viewed in the light of defendant's own assertions, the sentencing scheme does not appear unconstitutionally irrational. The two sections arguably counterbalance one another; therefore, we cannot agree with defendant's contention that a conflict of constitutional proportions exists between section 5—5—3.2(b)(6) and the remainder of Illinois law.

■ We further note that both defendants' broad assertion that consent is a defense to a charge of battery under Illinois law is unsubstantiated. The single case defendants cite in support, *People v. Dudgeon* (1950), 341 Ill. App. 533, is not helpful. *Dudgeon* is a sex case that focuses on a masked man's assault upon a woman. Dudgeon argued that, because the complainant consented to the ultimate act of sexual intercourse, she also consented to every act, including assault and battery, that led up to the ultimate act. This court emphatically rejected Dudgeon's consent defense and held that, because the com-

plainant did not consent to Dudgeon's assault upon her, Dudgeon was properly found guilty of assault and battery by the court below.

Nor does the legal treatise cited by defendants support their contention that consent is a defense to battery. Decker's *Illinois Criminal Law* cites *Dudgeon* only for the proposition that consent has been recognized as a defense to *assault*. (J. Decker, Illinois Criminal Law ch. 9, at 305 n.113 (1986).) The treatise further states that "[w]here a defendant brutally beats a victim, he or she has no defense to a battery charge assuming the victim agreed to the beating." J. Decker, Illinois Criminal Law ch. 19, at 724 (1986).

Defendants propose that their belief that Smith consented to the violation is legal justification for their actions. Defendants cite *People v. Reagan* (1983), 99 Ill. 2d 238, as authority for the proposition that there can be no intent to commit an offense if the defendant believes that there is justification for his actions. We find *Reagan* to be entirely distinguishable from the case at hand. In *Reagan*, the defendant was charged with "attempted manslaughter." The justification proffered for his actions was self-defense. Here, the purported legal justification for beating Smith is his consent. Defendants' attempt to equate self-defense with license is unconvincing.

Furthermore, an accused is not entitled to raise the defense of justifiable use of force against a charge of aggravated battery if the accused was the aggressor. (*People v. Lockwood* (1976), 37 Ill. App. 3d 502, 505.) The record indicates to us that the participating gang members were the aggressors here. Smith's friend Prado testified that the gang was out to get those who, like Prado and Smith, had stopped hanging around with them. Diaz testified that the new violation rule was adopted by the gang only one month prior to Smith's beating. No evidence was introduced to suggest that Smith played any part in the gang's decision to adopt the new rule. Smith testified that he did not want to undergo a violation at any time. Olivero testified that Smith was told he would have to take a violation and that he could "get it now" or "whenever they see him." Olivero further testified that Smith asked for one-on-one but was told that he had to fight three people.

For the reasons stated above, we affirm the judgments of the circuit court of Lake County.

Affirmed.

INGLIS, P.J., and DOYLE, J., concur.