THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID TURNER, Defendant-Appellant.

First District (1st Division)   No. 1—94—2381

Opinion filed July 15, 1996.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a bench trial defendant, David Turner, was found guilty of first-degree murder and aggravated kidnapping. He was sentenced to consecutive prison terms of natural life for first-degree murder and 30 years for aggravated kidnapping. On appeal, defendant argues: (1) the State failed to prove him guilty of first-degree

murder beyond a reasonable doubt; (2) the State failed to prove him guilty of aggravated kidnapping beyond a reasonable doubt; and (3) the imposed sentence was improper.

BACKGROUND

Willie Williams and Pamela Powers were murdered the night of October 1, 1990. Defendant and Gerald Reed were charged with two counts of first-degree murder and one count of aggravated kidnapping. The cases were severed, but tried simultaneously. Defendant chose a bench trial, while Reed chose a trial by jury. The following testimony was elicited at trial.

Lille Bell testified for the State. On October 1, 1990, she lived in the second-floor apartment at 6840$^1$/$_2$ South Perry Street in Chicago, Illinois. At around 7 p.m. on October 1, Bell and her neighbor, Mia Grover, walked across the street to visit Powers at her apartment. At that time, Powers was fully dressed and wearing shoes. Defendant and Reed were also at Powers' apartment. Williams arrived at Powers' apartment 15 minutes later. According to Bell, the six of them stayed at Powers' apartment for a while, and then everyone, except Williams, left. Grover and Powers went to Bell's apartment across the street. Defendant, Reed, and Bell went to defendant's house at 315 West Marquette to check on defendant's son. Bell stated that they took a shortcut to defendant's house through a viaduct at Kennedy-King College.

Defendant, Reed, and Bell returned to Bell's apartment at around 9:30 p.m. Grover joined them for a few drinks and they remained for about 20 minutes. Bell stated that she and Grover then went to the store, and when they returned to Bell's apartment 20 minutes later, defendant and Reed were still there. Defendant and Reed left shortly thereafter and Bell and Grover went to a neighbor's apartment. Sometime later defendant came up the stairs leading to the porch that Bell shared with the neighbor she was visiting, and she and defendant returned to Bell's apartment.

Bell further testified that Reed and Powers joined them in Bell's apartment a short time later. According to Bell, Powers looked "freaked out" and she was not wearing shoes or a coat. Powers walked as Reed guided her into the bathroom. Bell heard Reed say, "Where is the money?" She also heard him ask defendant, who was about 15 feet away from the bathroom, to find some shoes for Powers. At this point, Bell took her bottle of wine and went to her neighbor's apartment. When Bell returned to her apartment 40 minutes later, defendant, Reed, and Powers were gone.

Defendant and Reed returned to Bell's apartment approximately

40 minutes later, without Powers. When Bell asked defendant about Powers, defendant told her Powers was gone, and Reed said that she had run off. Bell also testified that she kept a "community gun," a .357 magnum, in her closet, which she had seen in the possession of defendant and Reed several times. The police could not find the gun when they searched Bell's apartment.

Mia Grover also testified for the State. Grover testified that when they were at Powers' apartment at the beginning of the evening on October 1, Powers told them that Williams was on his way to Powers' apartment to bring them money. According to Grover, Williams arrived 15 minutes later and gave some money to Powers.

At 11 p.m., Grover was in the hallway outside her apartment when Reed and Powers came up the stairs on their way to Bell's apartment. Powers was wearing a sweater and blue jeans, but no shoes. According to Grover, Powers looked scared and she did not respond when Grover asked her what was wrong. Powers and Reed went into Bell's apartment and Reed closed the door. Grover stood outside the door and heard defendant, who was in Bell's apartment, say, "We are not going to have this shit, bitch." Grover then heard Reed mention something about a car. Defendant responded that he did not need a car and then stated, "I will drop this bitch behind Kennedy-King." Grover went back to her apartment, and when she returned to Bell's apartment 30 minutes later, no one was there.

Grover further testified that at about 1 a.m., she went to Bell's apartment again. Defendant, Reed, and Bell were present. Defendant asked Grover if she knew where Powers was and Grover told him the last time she had seen Powers, she was coming up the stairs with Reed. Defendant then asked her if she was ready to die, and she answered "no." After defendant and Reed left Bell's apartment, Grover and Bell looked for the "community gun" in Bell's closet and could not find it.

Robert Rounds, who worked at a Shell gas station at 6659 South Wentworth, testified that at around 1 a.m. on October 2, he heard a gunshot coming from the area of Kennedy-King College, which was about 175 yards away.

Around 2 a.m. on October 2, the police discovered Powers, who had a slight pulse, lying in the viaduct northwest of Kennedy-King College. She was naked from the waist down and had two gunshot wounds to the head. Chicago police officer Theodore Roberts testified that Powers was found in a secluded area that did not have a lot of foot traffic at 2 o'clock in the morning. Powers later died at the hospital.

Terrell Smith, Grover's boy friend, testified that, at around 1

p.m. on October 2, he went to Powers' apartment looking for Grover. The apartment had been ransacked. He found Williams dead on the bathroom floor, with gunshot wounds to the head and chest.

DeShawn Jackson and William Turner, defendant's nephew, testified that around 3 p.m. on October 2, they were in their backyard at 315 West Marquette with Reed. According to both Jackson and Turner, Reed asked if they had heard anything about a murder near Kennedy-King College. They both replied that they had not, and Reed stated, "Well, anyway, I did it." When Reed made this statement he also raised his shirt, revealing the handle of a .357 magnum.

Officer Ron Salter, a Chicago police officer assigned to the crime laboratory, testified that he recovered a bullet from a wall in the hallway of Bell's and Grover's apartment building. Bell had testified that, two weeks prior to the murders, she had accidently fired the .357 magnum she kept in her closet while she and defendant were "playing" with it, and the bullet became lodged in the hallway wall.

Officer Robert Smith, who was assigned to the firearms identification section of the crime laboratory, testified that the bullet recovered by Officer Salter from the hallway wall, a bullet recovered from Williams, and two bullets recovered from Powers were all .38-caliber bullets fired from the same .357-magnum revolver.

The parties also stipulated that if Officer Bob Berk, from the trace unit of the crime laboratory, had testified, he would have opined that a small piece of glass recovered from one of defendant's shoes "had similar optical properties" to a particle of glass recovered from where Powers' body was found. However, he would not have said with 100% certainty that the glass from defendant's shoe came from the glass found at the crime scene.

Assistant State's Attorney Frank DiFranco testified that on October 4, 1990, Reed made a post-arrest written statement that explained that defendant wanted to rob Williams because Williams did not have a gun. According to his statement, Reed went to Powers' apartment and saw defendant rifling through Williams' pants pockets. Williams asked defendant what he was doing with his pants and defendant shot him. Defendant then yelled at Powers to tell them where the money was. He then asked Williams where the money was, and when Williams did not answer, he shot him again. Reed then took Powers to Bell's apartment, where defendant met them soon after. Defendant again asked Powers where the money was. Reed knew that defendant wanted to kill Powers in Bell's apartment, but Reed thought there were too many people there so he suggested that he get his car. Defendant replied that they did not need a car and he would take Powers over to Kennedy-King College and kill

her there. He also stated that they went back to defendant's house, where they met Bell, and defendant told Bell that he had just killed her girl friend.

Defendant rested without calling any witnesses. After closing arguments, the trial judge stated that the most damning evidence against defendant was Reed's statement. However, the judge explained that he could not consider Reed's statement, as that would violate defendant's right to confront witnesses because Reed never took the stand. The court found defendant guilty of Powers' aggravated kidnapping and first-degree murder, but not guilty of Williams's first-degree murder.

Defendant's sentencing hearing consisted of two phases. During the first phase, the State argued that defendant was eligible for the death penalty, and the court agreed. During the second phase, the State presented evidence in aggravation to show the imposition of the death penalty was warranted. The State called four witnesses.

Chicago police officer Timothy McAuliffe testified that on April 17, 1988, he arrested defendant for burglarizing a church. Chicago police officer Arthur Holdman testified that he conducted a "wing search" for contraband in the section of the county jail where defendant was housed after his arrest for Powers' murder. Officer Holdman recovered a metal object, which was six inches long and shaped like a knife, from under defendant's mattress.

Deandre Gatlin testified that on September 5, 1990, defendant robbed him at gunpoint. Gatlin testified that his brother had lived with defendant's sister, and shortly before the alleged armed robbery the two had ended their relationship. Gatlin stated that the case against defendant was thrown out of court because Gatlin did not want to testify. Finally, Ida Houston, Powers' mother, testified to the physical and emotional strains she has suffered due to her daughter's death.

The State also submitted a summary of defendant's prior criminal record, consisting of 20 convictions while defendant was between 18 and 30 years of age. The State argued that the crimes had gotten progressively more serious. The State also argued that Powers was tortured from 10:30 p.m. until her death, as she probably knew that defendant was going to kill her. The State urged the court to impose the death penalty or, alternatively, natural life in prison or a 100-year extended-term sentence.

Defendant's sister, Mozelle, testified for defendant in mitigation. She suggested that Gatlin had fabricated the armed robbery. Defendant also introduced a group of letters on his behalf written by friends and family. When given the chance to make a statement, defendant stated that he had nothing to say.

On March 22, 1994, the court sentenced defendant to consecutive prison terms of natural life for the first-degree murder of Powers and 30 years for her aggravated kidnapping. The court decided not to impose the death penalty because the jury in Reed's case had not sentenced him to death. The court found defendant to have no rehabilitative potential. Defendant did not file a post-sentencing motion challenging the correctness of his sentence.

DISCUSSION

I. First-Degree Murder

Defendant first argues that he was not proved guilty beyond a reasonable doubt of first-degree murder. He claims that the evidence does not show that he caused or intended to cause Powers' death or that he was legally accountable for her murder.

■ A person commits first-degree murder if he performs the acts that cause the death and he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another, or knows that such acts create a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9—1(a)(1), (a)(2) (West Supp. 1995). Where a criminal conviction is challenged on the sufficiency of the evidence, the reviewing court, considering all of the evidence in a light most favorable to the State, must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wilson,* 155 Ill. 2d 374, 379, 614 N.E.2d 1227, 1229 (1993).

■ This standard applies regardless of whether the evidence is direct or circumstantial. *People v. Denton,* 264 Ill. App. 3d 793, 798, 637 N.E.2d 1066, 1070 (1994). Thus, a criminal conviction will not be disturbed unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt as to defendant's guilt. *People v. Salazar,* 211 Ill. App. 3d 899, 906, 570 N.E.2d 802, 807 (1991). We cannot hold that the circumstantial evidence in this case is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt as to defendant's guilt.

On the evening of her murder, Powers was last seen by Bell with defendant and Reed. Bell left the three of them in her apartment and when she returned they were gone. When Reed and defendant returned, Powers was not with them. At approximately the same time they were gone, a gas station attendant heard two gunshots coming from the area of Kennedy-King College. Earlier in the evening, defendant demanded that Powers give him the money she had

received from Williams. Grover testified that she heard defendant and Reed talking while they were in Bell's apartment with Powers, and during this conversation she heard defendant state, "I will drop this bitch behind Kennedy-King." When defendant made this statement, he was referring to Powers. Powers was found under the viaduct behind Kennedy-King College, just where defendant said he would take her. Finally, Officer Berk testified that a small piece of glass recovered from one of defendant's shoes possessed optical properties consistent with a particle of glass recovered from the viaduct where Powers' body was found.

Furthermore, the evidence showed that defendant had access to the .357 magnum used to murder Powers. The gun was kept in Bell's apartment, and Bell testified that she and defendant had been "playing" with the gun two weeks earlier. Officer Smith testified that the bullet in the hallway matched the bullets recovered from Powers' body and that these bullets were fired from the same .357 magnum. Grover testified that she and Bell could not find the gun after defendant and Reed left Bell's apartment the night Powers was shot.

■ There was also enough evidence to find defendant guilty on the theory of accountability. To convict a defendant based on a theory of accountability, the State must prove beyond a reasonable doubt that (1) the defendant solicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the crime; (2) the defendant's participation occurred either before or during the commission of the crime; and (3) the defendant had the concurrent, specific intent to promote or facilitate the commission of the crime. *People v. Martin*, 271 Ill. App. 3d 346, 351, 648 N.E.2d 992, 997 (1995); 720 ILCS 5/5—2(c) (West 1992). Further, "the 'common design rule' provides that where two or more people engage in a common criminal design, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are accountable for those acts." *Martin*, 271 Ill. App. 3d at 351, 648 N.E.2d at 997.

Factors considered in determining the defendant's legal accountability include the defendant's presence during the commission of the crime without opposing or disapproving of it, the defendant's failure to report the crime, and the defendant's continued association with the perpetrator after the criminal act. *People v. Morales*, 251 Ill. App. 3d 1001, 1012, 623 N.E.2d 864, 871-72 (1993). The fact that the defendant was the last person seen with the victim also supports a murder conviction based on legal accountability. *People v. McFee*, 230 Ill. App. 3d 356, 364, 595 N.E.2d 64, 69 (1992).

■ As discussed above, the evidence shows that defendant was

present when Powers was murdered. He and Reed were the last people seen with Powers that night. The trial testimony showed defendant wanted Powers' money and he was the one who decided where to "drop her." His statements and actions demonstrated defendant's intent to facilitate the commission of Powers' murder.

■ Defendant contends that the trial court's finding of defendant's guilt was based on Reed's statement, which was not admissible against defendant. This argument is unfounded. Not only must this court assume that the trial court considered only competent evidence in reaching its finding, but the trial court unequivocally stated that it did not use Reed's statement as evidence against defendant.

■ Defendant also claims that the trial court relied on facts not in evidence. Specifically, defendant claims the court mistakenly found that two weeks prior to the murder, defendant fired the murder weapon into a wall, when Bell's testimony indicated that Bell caused the gun to fire. Who caused the gun to fire two weeks prior to Powers' murder is irrelevant to who murdered Powers. Bell's testimony showed defendant knew where the gun was located and he had access to it on the night Powers was shot. Furthermore, Bell's testimony provided a basis for linking the bullet lodged in the hallway wall to the bullets that killed Powers. If the court made such a finding, it was harmless error.

■ Defendant also argues that the court's finding that defendant threatened Powers was unsupported by the record. The record indicates that defendant said, "We are not going to have this shit, bitch," to Powers. She was also present when defendant told Reed that he would drop her behind Kennedy-King. These statements supported a conclusion that Powers was being threatened by defendant.

■ Finally, defendant argues that the court ignored the testimony that Reed told Jackson and Turner that he had murdered Powers. However, Reed's statement does not necessarily mean that he alone killed Powers and this evidence does not preclude a finding that defendant was guilty based on an accountability theory.

## II. Aggravated Kidnapping

■ Defendant also claims that the evidence failed to prove him guilty of the aggravated kidnapping of Powers and did not show that any kidnapping occurred at all. A kidnapping is committed when a defendant knowingly and secretly confines another against her will. 720 ILCS 5/10—1(a) (West 1992). The crime of aggravated kidnapping is committed where the confinement is accompanied by the infliction of great bodily harm or the commission of another felony upon the victim. 720 ILCS 5/10—2(a)(3) (West 1992).

Within the meaning of the statute, "secret" may be defined as concealed, hidden, not made public, or kept from the knowledge or notice of persons who would be affected by the act. *People v. Franzen*, 251 Ill. App. 3d 813, 823-24, 622 N.E.2d 877, 887 (1993). "Confinement" is not strictly limited to the confinement within a house or a car. *Franzen*, 251 Ill. App. 3d at 824, 622 N.E.2d at 887. In *Franzen*, the court found secret confinement was proven "where the victim was dragged against her will from a well-lit parking lot to a place in a dark field where she was concealed from public view and not free to leave." *Franzen*, 251 Ill. App. 3d at 824, 622 N.E.2d at 887.

■ Powers was similarly confined in this case. She was taken across the street to Bell's apartment by Reed without her coat or shoes. She looked frightened and "freaked out," according to Bell and Grover. Reed guided her into the bathroom in Bell's apartment, where defendant interrogated her about Williams' money. At that point, she would have had to resist both Reed and defendant to leave Bell's apartment. The circumstantial evidence showed that Reed and defendant took her to the viaduct behind Kennedy-King College, which, according to Officer Roberts, was a secluded area without much traffic at that hour. Once there she was shot twice in the head.

It is doubtful that Powers voluntarily walked, shoeless, to her death. As stated earlier, defendant, Reed, and Powers were last seen together in Bell's apartment. When Bell returned to her apartment, the three of them were gone. Later, defendant and Reed returned without her. This circumstantial evidence clearly supports defendant's conviction for aggravated kidnapping.

### III. Sentencing

■ Defendant finally contends that his sentence is inappropriate because the trial judge considered factors not supported by the record. The State argues that defendant has waived this issue because he failed to file a post-sentencing motion challenging the correctness or length of his sentence.

In *People v. Lewis*, 158 Ill. 2d 386, 634 N.E.2d 717 (1994), the Illinois Supreme Court found that section 5—8—1(c) of the Unified Code of Corrections did not require a defendant to file a post-sentencing motion as a prerequisite to appeal matters related to sentencing. *Lewis*, 158 Ill. 2d at 390, 634 N.E.2d at 719. The version of section 5—8—1(c) applicable at the time the sentence was imposed in *Lewis* provided that "[a] motion to reduce a sentence *may* be made, or the court *may* reduce a sentence without motion, within 30 days after the sentence is imposed." (Emphasis added.) 730 ILCS 5/5—8—1(c) (West 1992). The supreme court found this language permitted a post-sentencing motion but did not mandate it.

Effective August 11, 1993, section 5—8—1(c) was amended to add the following sentence: "A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence." 730 ILCS 5/5—8—1(c) (West Supp. 1995). This amendment required defendant to raise his sentencing issue in a written post-sentencing motion. *People v. McCleary*, 278 Ill. App. 3d 498, 501, 663 N.E.2d 22, 24 (1996). Thus, defendant has waived this issue for purposes of appeal. Furthermore, we do not believe the sentence imposed constituted plain error.

    ■■■ "The plain error rule is a limited exception to the waiver rule and may be invoked only if the evidence is closely balanced, or where the alleged error is so fundamental that it may have deprived the defendant of a fair sentencing hearing." *People v. Beals*, 162 Ill. 2d 497, 511, 643 N.E.2d 789, 796 (1994). We find the evidence was not closely balanced at defendant's sentencing hearing. Neither was the error defendant claims so fundamental that he may have been deprived of a fair hearing.

    Accordingly, for the foregoing reasons, defendant's convictions and sentence are hereby affirmed.

Affirmed.

WOLFSON and BRADEN, JJ., concur.