FIFTH DIVISION

                                                 January 12, 2001

Nos. 1-98-3963 & 1-98-3964 (consolidated)

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

HERIBERTO JUARBE and IGNANCIO SOTO,

Defendants-Appellants.

))))))

)

)

)

)

 

 

Appeal from the

Circuit Court of

Cook County

Honorable

Thomas Tucker,

Judge Presiding.

 PRESIDING JUSTICE QUINN delivered the opinion of the court: 

 
Following a bench trial, defendants Heriberto Juarbe and Ignancio Soto were convicted of possession of a controlled substance with 
intent to deliver (720 ILCS 570/401(a)(2)(D) (West 1998)), and sentenced to prison terms of 22 years and 18 years,  respectively.  In this consolidated appeal, defendants contend that the trial court erred in: (1) denying their motion to quash arrest and suppress evidence; (2) admitting other crimes evidence; and (3) finding that Soto was proven guilty beyond a reasonable doubt.  For the reasons that follow, we affirm.

Prior to trial, defendants filed a motion to quash arrest and suppress evidence, alleging that the police officers lacked probable cause to stop Juarbe's vehicle.   Defendants also alleged that they were seized and detained an unreasonable amount of time and that Juarbe's vehicle was searched without his consent or, if he did consent, the search exceeded the scope of the consent given.   At the hearing on the motion to quash arrest and suppress evidence, Juarbe testified that on March 13, 1997, he was driving a truck he owned with Soto as a passenger, headed east on Frontage Road in Westchester, Illinois.  Juarbe testified that when he reached Mannheim Road, he stopped at a red light.  When the light turned green, he drove through the intersection to the entrance ramp leading on to the eastbound Eisenhower Expressway.  As Juarbe exited the expressway at Harlem Avenue, he noticed an unmarked police car with its lights activated.  Juarbe testified that he did not think the police car was following him, but when the police car signaled him to stop, he did so immediately.  When the officer, Sergeant Kevin Keag, asked for Juarbe's license and registration, he provided both.  When Juarbe asked the officer why he was stopped, Keag did not respond and directed Juarbe and Soto to exit the vehicle immediately.  Juarbe admitted that he gave Keag consent to search the vehicle.  

Subsequently, Officer Dominic Luciano arrived.  Keag searched Juarbe's vehicle while Luciano searched both Juarbe and Soto.  Juarbe estimated that the search of the vehicle took approximately 10 minutes.  Keag then gave Soto the keys in order to move the vehicle, and after doing so, Soto was placed into another squad car.

Juarbe testified that an hour passed from the time he was first placed in the police car until a narcotics detector dog arrived.  On cross-examination, Juarbe admitted that his vehicle had darkly tinted windows and two separate trap compartments in both of the rear seat armrests.     

Sergeant Keag, an 18-year veteran of the Westchester police department, testified that in April 1996 he became involved in a narcotics investigation with the Chicago police department gang unit, a Federal Bureau of Investigation (FBI) task force and agents of the Internal Revenue Service (IRS), who were investigating an illegal narcotics organization operated by Anselmo Zepeda.

Keag testified that he was asked to conduct surveillance of the apartment of Zepeda's girlfriend, who lived in Westchester.  Over the course of several months, Keag watched for Zepeda to visit the apartment, recorded license plate numbers of vehicles that visited the apartment, and checked the ownership of those vehicles. 

On October 21, 1996, Keag became aware of another apartment located at 22 Acera Drive in Hillside, Illinois.  Upon learning that this apartment was a "stash house" leased to Zepeda, Keag testified that he watched this apartment approximately 100 times between October 21, 1996, and March 13, 1997.  During his surveillance, Keag observed vehicles arriving and leaving within five minutes at various times of the day and night.  Keag wrote down the license plate numbers and types of vehicles that visited the apartment and ran a check of the license plate numbers to obtain information on the vehicle owners.  Keag discovered that a vehicle registered to Juarbe visited that apartment approximately eight times between December 6, 1996, and March 13, 1997,  the date of Juarbe's arrest.  Keag testified that Juarbe's vehicle was a two-tone gold Chevrolet Tahoe bearing "peace" license plates.  Keag also observed a vehicle registered in Soto's name at the apartment approximately five or six times from October 22, 1996, until the date of Soto's arrest.  Keag testified, however, that he did not actually see Soto at the location prior to March 13, 1997, and that while he recognized Juarbe, he did not recognize Soto when he stopped Juarbe's vehicle.

On March 13, 1997, at approximately 12:15 p.m., Keag testified that he searched for Zepeda at 22 Acera Drive because there was a warrant for his arrest.  As Keag watched the apartment, he saw Juarbe's vehicle parked there and, later, saw Juarbe and Soto leave the apartment together.  Juarbe held what appeared to be a white paper bag to his chest while he continually looked back and forth until he got into his vehicle.  Juarbe was in the driver's seat and Soto was in the front passenger side of the vehicle.  Keag testified that once they entered the vehicle, he could not see inside because the windows were tinted.  Keag then drove his unmarked squad car to Roosevelt Road and Oakridge and waited until defendants drove away from the apartment.  Keag followed defendants and testified that he did so because he wanted to find out where they were going and what was in the bag that Juarbe carried from the apartment.  Keag followed defendants from Oakridge to Harrison until defendants turned right, at which point Keag lost sight of the vehicle.  At this point, Keag contacted Officer Luciano and directed him to travel the Eisenhower Expressway in search of Juarbe's vehicle.  Keag directed Luciano to "go by Mannheim 290 and see if [he saw] a Suburban vehicle coming with a peace vehicle."  Keag then told Luciano to "see if [he] can knock it down."  Keag testified that the meaning of his words were to follow the vehicle and look for some reason to stop it. 

Keag testified that he caught up with defendants at the intersection of Harrison and Mannheim.  According to Keag, he was approximately six cars behind Juarbe's vehicle, which was the first one stopped at the red light.  As Keag waited for the light to turn green, he saw Juarbe's vehicle begin to slowly move through the intersection while the light was still red.  After Juarbe's vehicle ran the red light, Keag lost sight of it as defendants drove toward the entrance ramp to the expressway.  Once Keag caught sight of the vehicle again, he followed it.  Keag also contacted IRS Agent Lynette Redmer, informed her that he had seen a traffic violation and that he was going to stop the vehicle.  Keag testified that Agent Redmer approved of the stop.  

When defendants exited the expressway at Harlem Avenue, Keag moved directly behind Juarbe's vehicle, activated his lights and stopped the vehicle at approximately 12:30 p.m.  Once he approached the vehicle, Keag asked Juarbe to exit the vehicle and to retrieve his driver's license and registration.  Juarbe complied.  Keag then asked Juarbe if he had any drugs or weapons in the vehicle, to which Juarbe responded that he did not.  Keag testified that he asked Juarbe if he could look in the vehicle and told Juarbe that he observed him run a red light at Mannheim Road.  Juarbe nodded his head affirmatively.  Keag testified on cross-examination that he did not note in his report that he informed Juarbe of the traffic violation.  

Keag also asked Soto to exit the vehicle and to show identification.  When Soto showed Keag his identification, Keag recognized the name as the owner of one of the vehicles he had seen parked in front of the apartment at 22 Acera Drive.  Keag testified on cross-examination that he did not include this fact in his report. 

Keag walked to the passenger side of the vehicle and searched under the seats and dash, above the dash and alongside the panels, knocking to find out if there were any hollow spots contained in the panels.  Keag testified that he was looking for traps in the vehicle because the package he had seen was not visible and the organization he was investigating was known to use trap vehicles.  Keag did observe two white paper towels sitting on the back seat on the passenger side of the vehicle.  He then searched the driver's side of the vehicle in the same manner.  This search took approximately 10 minutes.  As traffic was backing up, Keag had Juarbe move his vehicle just west of Harlem Avenue while Keag followed in his unmarked squad car.  Officer Luciano and defendant Soto followed in Luciano's marked police car. 

At approximately 12:47 p.m., Keag radioed his dispatcher and requested a dog to search the vehicle.  The dispatcher responded that he was unable to get a dog to the scene.  Keag instructed the dispatcher to contact the Illinois State Police.  At approximately 1 p.m., State Trooper Pignatello arrived with a dog, which began the search by sniffing the outside of the vehicle.  The dog alerted on the rear doors of the vehicle.  After being led into the interior of the vehicle, the dog alerted at the armrests in the backseat of the vehicle.  

Trooper Pignatello retrieved a screwdriver and opened the armrest.  Several bundles of money were found.  When Trooper Pignatello opened the passenger side armrest in the backseat, he discovered two kilograms of cocaine sitting on top of more bundles of money. 

Keag informed Luciano of the money and drugs discovered.  Keag testified that Officer Luciano told him that he saw Soto put his head in his hands and that he uttered an obscenity.  Keag testified on cross-examination that Soto's use of the expletive was not included in his report because he did not hear him say it, but he was told this information by Luciano. 

According to Keag, defendants were taken into custody at approximately 1:12 p.m. and officially booked at the police station at approximately 1:29 p.m. 

On cross-examination, Keag admitted that he initially followed defendants because his primary concern was the contents of the white bag he saw Juarbe carry from the apartment.  Keag further testified that he never confiscated any narcotics from any of the persons he saw entering or exiting the apartment at 22 Acera Drive.

It was stipulated that, if Officer Luciano were called to testify, he would testify that he prepared a report in conjunction with the case and in that report he recorded the time of the offense as 1:29 p.m. and that Trooper Pignatello arrived with the dog at 1:45 p.m.

It was further stipulated that, if Trooper Pignatello were called to testify, he would testify that his report indicated that he arrived at the scene of the stop at approximately 1 p.m.

Finally, it was stipulated that Sergeant Sam Pulia would testify that audiotapes from which the transcripts were made included police radio communications from approximately 12:20 p.m. to 2:40 p.m.

Following arguments of counsel, the trial court denied defendants' motion to quash arrest and suppress evidence.  The court found that Keag's testimony was credible and that he had probable cause to stop Juarbe's vehicle after he observed the traffic violation.  The court further found that Keag obtained the proper consent from Juarbe to search the vehicle and that his question to Juarbe regarding whether he had any drugs or weapons was related to his request for permission to search the vehicle.  The court also found that it was reasonable for Keag to call a narcotics detecting dog because Keag had knowledge of Zepeda's use of trap vehicles to conceal narcotics.  The court ruled that the canine arrived in a reasonable amount of time and that defendants were detained a minimal amount of time based on the information that Keag had at the time of the stop. 

Also prior to trial, the State filed a motion 
in
 
limine
, requesting leave to present proof of other crimes evidence.  Specifically, the State's motion was based upon finding 62 kilograms of cocaine inside the apartment at 22 Acera Drive along with other drug paraphernalia, including scales, calculators, packaging, duct tape and baggies.  A kilogram wrapper, similar to the one found wrapped around the cocaine seized from the vehicle, was also found in the apartment with Soto's fingerprint on it.  Juarbe's fingerprint was found on one of the rolls of duct tape discovered in the apartment.  

After balancing the probative value of the evidence against its prejudicial effect, the court admitted the evidence recovered at the apartment based on the nexus between Soto and Juarbe and the apartment.  The court found that the evidence recovered within the apartment was probative of the package found in Juarbe's vehicle. 

At the bench trial, the parties stipulated to Keag's testimony at the motion to quash arrest and suppress evidence.  Keag testified at trial that the kilogram wrappers found in the vehicle were wrapped in duct tape.  Keag also testified as to the chain of custody of the vehicle and the items seized from the vehicle.  On cross-examination, Keag testified that he did not see either defendant touch the money found inside of the vehicle, nor did he see either of them touch the cocaine.   

The parties stipulated to the testimony of Gregory Bate, a forensic chemist, who, if called to testify, would state that his analysis revealed that both packages recovered from Juarbe's vehicle tested positive for the presence of cocaine.  One of the packages weighed 979.7 grams, while the other package weighed 902.1 grams.

IRS Agent Mark Johnson testified regarding the items that were recovered from the apartment at 22 Acera Drive.  Johnson testified that he and other agents recovered a duffle bag containing 21 kilograms of cocaine and a cardboard box containing cocaine, along with smaller bags of cocaine found in a closet.  Agents found a  total of 62 kilograms of cocaine in the bedroom of the apartment.

Agents also recovered two baggies containing white powder wrapped in duct tape.  Defendants objected to the relevancy of these items along with leases, receipts and pieces of paper with phone numbers recovered from the apartment.  The court overruled defendants' objection and found that these items were relevant in demonstrating an intent to deliver.  The court stated that it could be reasonably inferred that these items were tools of the drug trade. 

Charles Schauer, a fingerprint specialist for the Drug Enforcement Administration, testified that a dresser recovered at the apartment was processed for fingerprints.  Schauer testified that he compared the original fingerprints lifted from the dresser to Juarbe's fingerprints, and based upon a reasonable degree of certainty, Schauer matched one of the fingerprints taken from the inside rear of the top dresser drawer to Juarbe's left index finger.  Schauer also processed various drug paraphernalia seized from the apartment.  Schauer testified that, based on a reasonable degree of certainty, a fingerprint taken from the inside of one of the Ziploc bags recovered matched Soto's right thumb fingerprint and a fingerprint taken from one of the rolls of duct tape matched Juarbe's right index finger.  Schauer also found that fingerprints lifted from the apartment lease matched Soto's left index finger.  On cross-examination, Schauer testified that there was no way to tell when these fingerprints were placed on the items or whether these items were in the apartment at the time the fingerprints were made. 

Following the close of the State's case, Juarbe made a motion for a directed finding, which the court denied.  Soto rested his case, and following closing arguments, the court found Soto guilty of possession of a controlled substance with intent to deliver.

Jack Dugan, a private investigator, was called to testify on Juarbe's behalf.  Dugan testified that he took pictures of the intersection at Mannheim Road and Harrison where Keag testified that Juarbe ran the red light.  Dugan testified that he drove through the intersection several times and was also stopped at the red light while traveling eastbound on Harrison.  In Dugan's  opinion, the sixth vehicle in line at the stop light could not see the first vehicle in line.  

In rebuttal, Mark Borkevic, a Westchester police officer, testified that on July 1, 1998, at approximately 12:25 p.m., he was present when the intersection of Mannheim Road and Harrison was  videotaped.  Borkevic testified that he was at the intersection of Mannheim Road and Harrison for approximately 10 minutes and observed several vehicles stopped at the light.  Borkevic testified that the videotape truly and accurately depicted the flow of traffic he observed on that day.  In Borkevic's opinion, it was possible to see the first vehicle stopped at the intersection even five or six vehicles behind it.  Borkevic admitted that the ability to see the first vehicle depended upon the types and sizes of vehicles behind the first vehicle. 

Following closing arguments, the court found Juarbe guilty of possession of a controlled substance with intent to deliver.  Juarbe and Soto were sentenced to 22 years' and 18 years' imprisonment, respectively.  Defendants' timely appeal followed.

Defendants first contend that the trial court erred in denying their motion to quash arrest and suppress evidence.  In general, when considering a trial court's ruling on a motion to suppress, a reviewing court will accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence.  
In re G.O.
, 191 Ill. 2d 37, 50, 727 N.E.2d 1003 (2000).  Here, the only facts in dispute were whether Juarbe ran the red light and how long the parties had to wait for the dog to arrive.  As we accept the trial judge's factual findings, we review the denial of defendant's motion to quash the arrest and suppress evidence 
de
 
novo
.  
People v. Wardlow
, 183 Ill. 2d 306, 311, 701 N.E.2d 484 (1998), 
cert. granted
, 526 U.S. 1097, 143 L. Ed. 2d 669, 119 S. Ct. 1573 (1999).   

In a motion to suppress, the burden is on the defendant to establish that the search or seizure was unreasonable or unlawful.  
People v. Scott
, 249 Ill. App. 3d 597, 600, 619 N.E.2d 809 (1993).  The defendant must establish a 
prima
 
facie
 case that the police acted without a warrant and that the defendant was doing nothing to justify the intrusion by the police at the time of the stop or arrest.  
People v. Ertl
, 292 Ill. App. 3d 863, 868, 686 N.E.2d 738 (1997).  Once the defendant has made a 
prima
 
facie
 showing, the burden of going forward with evidence to justify the stop or arrest shifts to the State.  
People v. Drake
, 288 Ill. App. 3d 963, 967, 683 N.E.2d 1215 (1997).  

An exception to the warrant requirement is the 
Terry
 stop, which is invoked here.  Under 
Terry v. Ohio
, 392 U.S. 1, 21-22, 2 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968), the fourth
 amendment to the United States Constitution permits an officer to make a valid investigatory stop of a person without probable cause to arrest when there is a reasonable suspicion of criminal activity.  
People v. Branch
, 295 Ill. App. 3d 110, 112, 692 N.E.2d 398 (1998).  "For the police to justify such a detention, they must point to specific, articulable facts which, when taken together with natural inferences, make the intrusion reasonable - such as when the officer observes unusual conduct which leads him reasonably to conclude in the light of his experience that criminal activity may be afoot."  
Ertl
, 292 Ill. App. 3d at 868-69.

A threshold question is whether Soto had standing to challenge the search.  Generally, a passenger lacks standing to challenge the search of another's vehicle unless the passenger has a legitimate expectation of privacy in the place searched.  
Rakas v. Illinois
, 439 U.S. 128, 135, 58 L. Ed. 2d 387, 395, 99 S. Ct. 421, 426, (1978); 
United States v. Duprey
, 895 F.2d 303, 309 (7th
 Cir. 1989); 
People v. Manikowski
, 186 Ill. App. 3d 1007, 1010, 542 N.E.2d 1148 (1989).

A defendant who objects to the search of a particular area must prove a legitimate expectation of privacy in the area searched.  
Rawlings v. Kentucky
, 448 U.S. 98, 104, 65 L. Ed. 2d 633, 641, 100 S. Ct. 2556, 2561 (1980).  This inquiry involves two questions: (1) whether the individual, by his conduct, has exhibited a subjective expectation of privacy; and (2) whether such an expectation is justifiable under the circumstances.  
Smith v. Maryland
, 442 U.S. 735, 740, 61 L. Ed. 2d 220, 226-27, 99 S. Ct. 2577, 2580 (1979).  The following factors have been recognized as relevant in answering these questions: (1) whether the defendant has a possessory interest in the place searched; (2) whether he has a right to exclude others therefrom; (3) whether he has exhibited a subjective expectation that the place remains free from governmental invasion; (4) whether normal precautions were taken to protect his privacy; and (5) whether he was legitimately on the premises.  
United States v. Peters
, 791 F.2d 1270, 1280 (7th
 Cir. 1986), quoting 
United States v. Haydel
, 649 F.2d 1152, 1155 (5th
 Cir. 1981).

Applying these factors to our facts reveals
 that: (1) Soto had no possessory interest in the vehicle; (2) there was no evidence that he had a right to exclude others from the vehicle; (3) he was present when Juarbe gave permission to search the car and he did not object even though he was legitimately in the car; and (4) there was no evidence as to any precautions he took.  Therefore, Soto had no reasonable expectation of privacy in the vehicle.  Consequently, Soto lacks standing to challenge the search.

Nevertheless, Soto argues that he had standing to challenge the search because the totality of police conduct amounted to an unlawful seizure of his person under the fourth amendment of the United States Constitution, relying on 
People v. Kunath
, 99 Ill. App. 3d 201, 205, 425 N.E.2d 486 (1981).  In 
Kunath
, this court opined, "
Rakas
 did not deal with the question of standing to contest an unconstitutional 
stop
."  (Emphasis in original.)  
Kunath
, 99 Ill. App. 3d at 204.  The State conceded in 
Kunath
 that the police acted without probable cause to stop the car in which Kunath was a passenger.  As the stop was improper, it constituted a violation of Kunath's constitutional right to be free from any  unreasonable seizure of his person and the evidence seized was properly suppressed by the trial court.  
Kunath
, 99 Ill. App. 3d at 206.

We find 
Kunath
 to be factually inapposite.  Here, as in 
Manikowski
, the vehicle in which Soto was a passenger was stopped for a traffic offense.  As running a red light was a reasonable basis for Sergeant Keag to stop and detain defendants, Soto does not have standing to contest the search.  
People v. Flowers
, 111 Ill. App. 3d 348, 354, 444 N.E.2d 242 (1982); 
Manikowski
, 186 Ill. App. 3d at 1010-11. 

Juarbe, as owner and driver of the vehicle, does have standing and we now turn to the lawfulness of the stop and search of the vehicle as it relates to his conviction.  Defendants argue that the police did not have sufficient grounds to justify the stop of Juarbe's vehicle because the pretextual nature of the stop placed Sergeant Keag's credibility at issue where he testified that defendant Juarbe committed a traffic violation by running a red light.  

It is well settled that the fourth
 amendment does not prohibit pretextual traffic stops.  In 
Whren v. United States
, 517 U.S. 806, 135 L. Ed.2d 89, 116 S. Ct. 1769 (1996), the United States Supreme Court held that ulterior motives do not invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of the law has occurred.  
Whren
, 517 U.S. at 813, 135 L. Ed.2d at 98, 116 S. Ct. at 1774.  The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officers involved.  
Whren
, 517 U.S. at 813, 135 L. Ed.2d at 98, 116 S. Ct. at 1774; 
People v. Thompson
, 283 Ill. App. 3d 796, 798, 670 N.E.2d 1129 (1996).  In 
Thompson
, the police received an anonymous tip that a van containing alcohol and guns was traveling from Carterville to Carbondale.  The police did not immediately stop the van but waited for the driver to commit a traffic violation.  Upon seeing that the van had a defective brake light, the police stopped the van.  The police used the faulty brake light as a pretext to see if the defendants were illegally transporting alcohol and guns. Citing 
Whren
, the court in 
Thompson
 held, "Even though the traffic offense masked other reasons for the stop unsupported by probable cause, ulterior motives cannot make otherwise lawful conduct illegal.  The pretextual nature of the stop did not invalidate it.  The police had probable cause for the stop.  The inquiry ends there."  
Thompson
, 283 Ill. App. 3d at 798-99.  

Here, defendants assert that Juarbe's testimony that he did not run a red light and that Sergeant Keag did not inform him of the traffic violation he allegedly committed upon stopping him shows a lack of probable cause.  We find defendants' argument unpersuasive.  Here, the trial court found Sergeant Keag's testimony regarding the traffic violation to be credible.  Sergeant Keag's testimony concerning defendant's position on the highway when he ran the red light, coupled with the testimony of Officer Borkevic that it was possible to see the first vehicle stopped at the light even if Keag was five or six cars behind defendants', was grounds for the trial court to believe that defendant Juarbe did indeed commit the traffic violation.  
The trial court is in the best position to determine the credibility of the witnesses on a motion to quash arrest and suppress evidence and to resolve conflicts in testimony because it has heard the testimony and observed the demeanor of the witnesses.  
People v. Evans
, 296 Ill. App. 3d 1, 9, 689 N.E.2d 142 (1997), citing 
People v. Carter
, 288 Ill. App. 3d 658, 662, 681 N.E.2d 41 (1997).  It is the trial judge's function in making a probable cause determination to weigh the testimony, assess the credibility of the witnesses, and draw reasonable inferences from the testimony.  
People v. 
Zinnamon
, 266 Ill. App. 3d 671, 676, 639 N.E.2d 1296 (1993).  We will not disturb the trial court's determination here.  

Defendants next contend that, even if the stop was justified, the conduct of the officers was not reasonably related to the circumstances justifying the stop.  Defendants first argue that it was improper for Keag to ask Juarbe if there were any drugs or weapons in the vehicle.    

Under 
Terry
, the Supreme Court set forth a dual inquiry for deciding whether an officer's investigative detention is reasonable: (1) "whether the officer's action was justified at its inception" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  
Terry
, 392 U.S. at 19-20,  L. Ed.2d at 905, 88 S. Ct. at 1879.  Stopping an automobile for a minor traffic violation does not, by itself, justify a search of the vehicle unless the officer reasonably believes he is confronting a situation more serious than a routine traffic violation.  
People v. Penny
, 188 Ill. App. 3d 499, 502, 544 N.E.2d 1015 (1989).  

In the instant case, we hold that Keag reasonably believed that he was confronted with a situation in which defendants were committing a more serious crime than a routine traffic violation.  Keag's belief was based on his knowledge of the Zepeda organization after conducting surveillance of the "stash house" at 22 Acera Drive over 100 times.  In addition, Keag observed defendant Juarbe clutching a white paper bag while exiting the apartment with Soto.  This information was supplemented by knowledge that a signed federal search warrant authorizing a search for narcotics had been issued for this apartment.  Therefore, based on this information, it was reasonable for Keag to ask defendant Juarbe if there were any drugs or weapons in the vehicle.

As to the reasonableness of the actions of the police, it is uncontested that Juarbe gave his consent to the search of his vehicle.  Juarbe did not testify that he felt he was under arrest prior to the narcotics being found.  The initial stop was made by a single officer in plain clothes.  Neither defendant was told to put his hands on the car.  The police even allowed Soto to enter the car and drive it from the scene of the stop.  As there was no unlawful arrest or seizure of either defendant, the cocaine that  was recovered was not the "fruit" of an illegal arrest and therefore should not be suppressed.  
Manikowski
, 186 Ill. App. 3d at 1011.  

Defendants also argue that even if the detention was justified, it was unconstitutionally prolonged.  Defendants assert that they were detained for approximately one hour awaiting the arrival of a detector dog.  We disagree.  Defendants rely on cases which state that a detention must end once the purpose of the stop has been accomplished.  See, 
e.g
., 
People v. Koutsakis
, 272 Ill. App. 3d 159, 163, 649 N.E.2d 605 (1995).  However, here, Keag had already been given consent to search and had done so, but based on his knowledge of the Zepeda organization, he expanded the search to include a detector dog.  Although defendants argue that this information was insufficient to expand the search, we hold that this is not the case.  Keag had extensive information that connected defendants to the Zepeda organization.  After Keag did not see the bag that Juarbe carried out of the apartment inside the car, his decision to request a narcotics detecting dog to further the search did not change the nature of the search.  Furthermore, the record reveals that Keag testified that he called for a detector dog at approximately 12:47 p.m. and was informed that there were no dogs available.  Once the Illinois State Police were contacted, Keag testified that a dog arrived at approximately 1 p.m.  We hold that this amount of time was not unreasonable to wait for the detector dog to arrive.  As the trial court was in the best position to weigh the credibility of the witness, we will not disturb the trial court's finding.    

Defendants next contend that the police lacked probable cause to arrest Soto for possession of controlled substances.  Defendants assert that there was no evidence presented that Soto had any degree of dominion or control over the vehicle or the contraband or that he had knowledge that it was in the vehicle.

Although probable cause requires more than mere suspicion, it does not require the arresting officers to have in their hands sufficient evidence to convict the defendant.  
People v. Moody
, 94 Ill. 2d 1, 445 N.E.2d 275 (1983).  The expertise and experience of the officer are to be taken into account as well.  
People v. Stamps
, 108 Ill. App. 3d 280, 438 N.E.2d 1282 (1982).  To establish that a possessory offense had taken place, the State would have had to present evidence tending to show that defendant knew of the presence of the contraband and that it was in his immediate and exclusive possession.  
People v. Denton
, 264 Ill. App. 3d 793, 798, 637 N.E.2d 1066 (1994); 
People v. Mason
, 213 Ill. App. 3d 163, 167, 571 N.E.2d 1127 (1991).  Where two or more people share immediate and exclusive control or share the intention and power to exercise control, there arises a situation of joint possession.  
Denton
, 264 Ill. App. 3d at 798.  Even where there is no physical possession, constructive possession may exist where there is an intent and capacity to maintain control and dominion over the contraband, and this may be proved by showing that the defendant controlled the premises where it was found.  
Mason
, 213 Ill. App. 3d at 167.

In the present case, we hold that the State made a sufficient showing that defendant Soto knew of the contraband and that he exercised a degree of control over it.  The contraband was in a hidden compartment in the armrests of the vehicle owned by defendant Juarbe, which were immediately accessible to Soto, who was in the vehicle from the time they left the apartment together until the arrest.  The trial judge personally observed the hidden compartments open and close and noted for the record that they made a distinct grinding noise as they opened and closed.  Thus, it would be reasonable to conclude that Soto was aware of the narcotics in the vehicle.  Under these circumstances, we hold that the police officers possessed sufficient probable cause to arrest Soto for possession of a controlled substance and his motion to quash arrest and suppress evidence was properly denied.   

Defendants further contend that the State failed to prove Soto guilty beyond a reasonable doubt.  
In reviewing the sufficiency of the evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  
People v. Campbell
, 146 Ill. 2d 363, 374, 586 N.E.2d 1261 (1992).  Whether the requisite elements have been proven is a question for the trier of fact, and its findings will not be disturbed on review unless the evidence is contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to
 
create a reasonable doubt of guilt.  
People v. Turner
, 282 Ill. App. 3d 770, 777, 668 N.E.2d 1058 (1996).  A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses.  
People v. Cooper
, 283 Ill. App. 3d 86, 92, 669 N.E.2d 637 (1996).

Defendants argue that none of the additional facts typically relied upon by the courts in finding joint possession is present in this case.
  We disagree.  Contrary to defendants' assertion, there was sufficient evidence tying Soto to the narcotics.  
Soto and Juarbe left the apartment at 22 Acera Drive together.  This apartment was a known "stash house."  The State presented evidence that Soto's fingerprints were found on the lease to the apartment and on the inside of a Ziploc bag containing cocaine.  Additionally, there was no evidence presented that Soto got out of the vehicle prior to the stop by Officer Keag.  We also point out that the trial judge personally observed the hidden compartments open and close and noted for the record that they made a distinct grinding noise as they opened and closed.  Therefore, it was rational for a trier of fact to conclude that Soto was in the vehicle and was well aware of when the narcotics were placed in the hidden area.  This evidence is sufficient to sustain Soto's conviction.

Defendants finally contend that the trial court erred in admitting other crimes evidence.  
As with all other evidence, evidence of other crimes must be relevant.  
People v. Robinson
, 167 Ill. 2d 53, 62, 656 N.E.2d 1090 (1995).  Evidence of other crimes is admissible to demonstrate anything other than a propensity to commit crime, including:

"[a]mong other things, 
modus
 
operandi
, motive, knowledge, intent, absence of mistake or accident, defendant's state of mind, absence of an innocent mind frame or the presence of criminal intent, circumstances or context of defendant's arrest, placement of defendant in proximity to the time and place of the crime, identification of the weapon used in a crime, consciousness of guilt, to show a common design, scheme or plan, circumstances of a crime charged that would otherwise be unclear, whether a crime charged was actually committed, opportunity or preparation, a defendant's dislike or attitude toward the victim, to explain an otherwise implausible fact relating to the crime charged, to contradict on rebuttal a defendant's denials, to disprove a defense of entrapment and to disprove an alibi defense."  
People v. Millighan
, 265 Ill. App. 3d 967, 972-73, 638 N.E.2d 1150 (1994).  

Here, the use of other crimes evidence was relevant to show knowledge and intent.  The record reveals that Juarbe was seen at the apartment at 22 Acera Drive as were both defendants' vehicles,  on several occasions prior to their arrest on March 13, 1997.  Keag's surveillance of the apartment established that persons arrived and left the apartment frequently and usually stayed no longer than five minutes.  This conduct is indicative of the existence of drug activity.  Furthermore, defendants' fingerprints were found on duct tape, baggies and other items in the apartment.  This evidence was relevant to establish whether defendants had knowledge of the activity in the apartment, and coupled with the evidence found in Juarbe's car, assists in establishing whether defendants possessed controlled substances with an intent to deliver.
  In a bench trial, it is presumed that the trial judge considered only competent evidence in reaching his decision.  
People v. Lester
, 102 Ill. App. 3d 761, 768, 430 N.E.2d 358 (1981).  As the evidence presented in the present case clearly proved defendants' possession of controlled substances with an intent to deliver beyond a reasonable doubt, we will not disturb the trial court's determination upon review.  

Based on the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed. 

HARTMAN and GREIMAN, JJ., concur.