2023 IL App (2d) 200695-U
No. 2-20-0695
Order entered July 7, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-165 |
| MIGUEL A. RUIZ, | ) ) ) | Honorable C. Robert Tobin, III, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court erred by denying defendant's motion to suppress his inculpatory statement, where State troopers lacked probable cause to arrest defendant for possession of cocaine found in the passenger's pocket; absent defendant's statement, the evidence was sufficient to convict defendant of possession of cocaine based on the passenger's statement that the cocaine belonged to defendant. Trial court is affirmed.

¶ 2    Following a stipulated bench trial defendant, Miguel A. Ruiz was convicted of unlawful possession of between 15 and 100 grams of a substance containing cocaine (720 ILCS 570/402(a)(2)(A) (West 2018)), and the trial court sentenced him to nine years' imprisonment. Troopers discovered the cocaine on a passenger in defendant's vehicle following a traffic stop. On

appeal, defendant argues that 1) the trial court erred by denying his motion to quash arrest and suppress evidence, 2) he did not knowingly and voluntarily waive his right to a jury trial, and 3) he was denied a fair sentencing hearing and his sentence was excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This case involves a traffic stop of a vehicle in which defendant's brother, Ruben, was the passenger and defendant was the driver. A State trooper found a firearm and cocaine on Ruben's person and arrested defendant and Ruben. Prior to trial, defendant and Ruben filed motions to quash arrest and suppress evidence.

¶ 5      At the hearing on the motions to suppress, Illinois State Trooper Greg Melzer testified as follows. On May 4, 2018, Melzer was parked in the center emergency crossover on I-90 watching westbound traffic. Melzer saw a white Cadillac following a tractor trailer too closely on I-90. By using the timer function on his radar, Melzer determined that the Cadillac was travelling .7 seconds behind the tractor trailer, which was a traffic violation. Melzer pulled out into the highway, followed the Cadillac for about four miles, activated his lights, and stopped the Cadillac after it proceeded through a toll both at the Genoa Road exit. Melzer's squad car was equipped with a video camera. The video recording taken from Melzer's squad car camera was admitted into evidence. We note that the time stamp on the video recording establishes a timeline of events. In the description of facts that follows, parenthetical references to the time stamp represent the time of day (in hours, minutes, and seconds) at which particular events appear on the video recording.

¶ 6      Melzer testified that once the Cadillac stopped (5:43:37 p.m.), he approached it on the passenger side and saw Ruben in the passenger seat and defendant in the driver's seat. Melzer told defendant the reason he was stopped. Defendant told Melzer that he exited at Genoa because that was where he normally exited the highway to go home to Blair, Wisconsin. Melzer saw that Ruben

was not wearing a seatbelt. When Melzer mentioned it to Ruben, Ruben told him that he had just taken the seatbelt off.

¶ 7    Melzer did not see contraband or smell marijuana or alcohol. Upon Melzer's request defendant provided his driver's license. Defendant's driver's license was issued by Wisconsin. Melzer asked defendant where they were coming from and he replied, "Chicago." Melzer told defendant and Ruben that he was going to issue defendant a warning for following a vehicle too close and a warning to Ruben for not wearing a seatbelt.

¶ 8    Melzer testified that he then asked Ruben for his identification. When he asked Ruben for his identification,

> "[Ruben] continued to keep his back against the back of the seat and move slowly. He also had his right arm, right leg, and hip against the driver's [*sic*] side door. He appeared to be pressing his back, buttocks, hip, leg, right leg, right hip against the seat and door in what appeared to me to be an effort to conceal something. He was moving very slowly and didn't fully lean forward to like reach back like most people that I've encountered would when they're retrieving something from their back pocket."

In addition, Melzer testified that Ruben reached back "[s]lowly and kept himself pinned to the seat while he retrieved his wallet from his pocket."

¶ 9    Melzer testified that, next, he took defendant and Ruben's driver's licenses and asked defendant to join him in his squad car while he prepared the warnings. At 5:45 p.m., while seated in the squad car with defendant, Melzer sent a message to Sergeant Nicholas Colon for backup. "[O]ne of the primary reasons" Melzer requested backup was for safety concerns.

¶ 10    Melzer also testified that defendant was "nervous" as he sat in the passenger seat of the squad car and did not look at Melzer when they spoke, which Melzer described as "abnormal."

When Melzer asked defendant again why he exited at Genoa, his answer changed. Defendant said that he took that exit because he wanted to go to McDonald's and get some gas.

¶ 11    Melzer performed name searches on the computer to first determine whether defendant's and Ruben's Wisconsin driver's licenses were valid. Melzer explained that he was not able to write a written warning for a traffic violation for someone without a valid driver's license. The computer search accessed numerous databases, including a "concealed carry holder" database that indicated whether a name was registered in Illinois or any other state outside of Illinois.

¶ 12    Melzer testified that it took between six to eight minutes to complete a written warning. Melzer completed defendant's warning in about six minutes, but he did not complete Ruben's warning while at the scene. Sergeant Colon arrived at the scene at 5:47 p.m. At 5:48 Melzer called for a K-9 unit to do an open-air sniff of the Cadillac. Trooper Taylor and the K-9 unit arrived at 5:58 p.m. The entire stop lasted 15 minutes.

¶ 13    Sergeant Nicholas Colon testified as follows. Colon's squad car was equipped with a video camera. The video recording was admitted into evidence. Colon arrived at the scene at 5:46:57 p.m. Colon began questioning Ruben, who was still seated in the Cadillac. Melzer continued to work on defendant's written warning. Colon asked Ruben questions about his trip with defendant. Ruben stated that he and defendant had been in Alsip, Illinois, and were on their way back home to Blair, Wisconsin. Ruben also told Colon that the purpose of the trip was to visit an aunt who was sick in the hospital with a lung issue. After speaking with Ruben, Colon walked back to Melzer's squad car and spoke to defendant. Defendant told Colon that he and Ruben had been visiting family in the Back of the Yards neighborhood in Chicago. Defendant also said that they stayed in a Baymont hotel the night before and that everyone in the family was in good health except for an aunt who had diabetes. Defendant denied going to the hospital to see anyone (5:54:01). Colon testified that when he told defendant that his version of events did not match

Ruben's, he "took offense." Colon returned to the Cadillac and asked Ruben where they stayed the night before. Ruben replied that they stayed at a cousin's house and that one slept on the couch and the other on a La-Z-Boy chair.

¶ 14　Defendant asked if he needed a lawyer and Melzer told him that he was still only going to get a written warning. Melzer also told defendant that the inconsistencies in his and Ruben's stories raised suspicions. Colon returned to the Cadillac and spoke with Ruben. Colon then returned to Melzer's squad car and asked defendant if he and Ruben stayed the night in different places, and defendant replied, no. Melzer then told defendant that the Boone County K-9 was going to walk around the Cadillac. Defendant stated that, while in Chicago, nobody else was in the vehicle besides him and Ruben.

¶ 15　Colon testified that when he asked Ruben to step out of the Cadillac, he "started to maneuver his body as if he was hiding something." Colon asked Ruben if he was hiding or concealing anything "possibly in his right pocket because he was kind of turning his body in a way that was making me worried that he had something." When Colon asked Ruben to step out of the vehicle, he did not comply, so Colon opened the passenger door and Ruben pulled the door back to shut it. Colon opened the door again, as Deputy Rosencrantz approached the Cadillac. Colon told Ruben again that he needed to step out of the vehicle, and Ruben moved his right hand toward his right pocket. Colon told Ruben to stop moving his hands and to keep his hands where Colon could see them. "Then as [Ruben] proceeded to step out of the vehicle, I told him make sure your hands are where I can see them just because he was moving real [*sic*] slow and not too urgent to get out of the vehicle." When Ruben stepped out of the vehicle Colon saw a "black handgun in [Ruben's] front right pocket." Ruben told Colon, "I have a pistol." Colon removed the gun from Ruben's pocket and secured it in Melzer's patrol car. Colon asked Rosencranz to pat Ruben down. During the pat down, Rosencranz found in Ruben's pocket "a clear plastic bag containing

suspected cocaine." Melzer testified that after the gun and drugs were found, defendant and Ruben were handcuffed and taken to a toll plaza to be interviewed.

¶ 16    After argument, the trial court took the case under advisement. On July 10, 2020, the court issued a written order denying defendant's motion to quash arrest and suppress evidence.

¶ 17    In August 2020, the matter proceeded to a stipulated bench trial. Before the State set forth the stipulated evidence defense counsel asked about defendant's jury waiver and the following colloquy occurred:

"THE COURT: [Defendant], what the attorneys are talking about here is what the trial would look like, and I think that the main thing you and your attorneys are contesting at the appellate level would be my ruling regarding the motion to suppress, but regardless[,] right now as you sit here today, you've got a right to one of two types of trials, either a jury in front of 12 members of the community listening to all the evidence or a bench trial where I would listen to all the evidence. Do you understand the difference between the two?

DEFENDANT: Yes.

THE COURT: And I've got an obligation to tell you the worst case scenario. That's just one of the things I have to do before I accept the waiver. You're charged with possession of a controlled substance, in particular 15 to 100 grams of cocaine. That is punishable by a maximum sentence of 4 to 30 years in the Department of Corrections followed by two years of mandatory supervised release, fines up to $200,000. Do you understand that?

DEFENDANT: Yes.

THE COURT: Have you had a chance to talk to your attorney about whether you wanted to do a jury trial or a bench trial?

DEFENDANT: Yes.

> THE COURT: Which one is your choice?
>
> DEFENDANT: Bench trial."

Defendant signed a jury waiver form and the trial court found that defendant knowingly and voluntarily waived his right to a jury trial.

¶ 18     Thereafter, the parties agreed to proceed by stipulated bench trial wherein the court considered the testimony provided at the hearing on the motion to suppress and, *inter alia*, the following stipulated evidence. On May 4, 2018, Trooper Melzer conducted a traffic stop of defendant's vehicle because he was following too closely behind a truck. Melzer had defendant accompany him back to his police car to issue defendant a written warning. Shortly thereafter, Sergeant Colon arrived and approached Ruben, who remained in the front passenger seat of defendant's car. When Colon asked Ruben for his identification, Ruben moved in a way to keep his back pressed against the seat and toward the passenger door. Eventually, Colon asked Ruben to exit the car, and when Ruben exited, he grabbed at his front pocket. Ruben stated that there was a firearm in his pocket, and the troopers recovered the loaded firearm and secured it. Deputy Rosencranz then located in Ruben's front, left pocket, a white rock-like substance that was later determined to be 29 grams of cocaine.

¶ 19     The parties further stipulated that both defendant and Ruben were taken to a nearby toll plaza to be interviewed. After being Mirandized, defendant stated that the cocaine belonged to him, and that he gave it to Ruben during the traffic stop. After Ruben was Mirandized, he stated that he was holding the cocaine for defendant. Ruben also stated that the gun was his and that he did not have a firearm owner's identification card or a concealed carry permit to allow him to lawfully have the firearm on his person. After the interviews, defendant and Ruben were taken to the Boone County Sheriff's Department.

¶ 20    The trial court found defendant guilty of unlawful possession of between 15 and 100 grams of a substance containing cocaine possession of 28 grams of cocaine.

¶ 21    At the sentencing hearing, over defense counsel's objection, the prosecutor asked Detective Sergeant Chris Washburn, "What would be the significance of 28 grams in a single package possessed by one person[?]" Washburn replied, "It would be in excess of what a person – based upon anybody that I've ever talked to who is a user and is not expected to make sales, it would be excessive of what would be classified as personal use amount." The prosecutor asked, "why would that be more than what would be considered what somebody would buy in bulk for personal use?" Washburn replied, "if you're talking about, you know, what an average cocaine user would ingest on a single day, you're talking half a gram to maybe a single gram and now you're talking about purchasing a month's worth of cocaine, you know, at a single time. It just doesn't make sense because having that additional amount, it would increase the likelihood of detection by law enforcement."

¶ 22    On October 13, 2020, the trial court sentenced defendant to nine years' imprisonment for the possession of a controlled substance containing cocaine conviction.

¶ 23    Defendant filed a motion to reconsider which the trial court heard and denied on November 10, 2020. Defendant filed a timely notice of appeal on November 19, 2020.

¶ 24                                II. ANALYSIS

¶ 25                                A. Motion to Suppress

¶ 26    Defendant argues that the trial court erred in denying his motion to quash arrest and suppress evidence because the officers lacked probable cause to arrest him. Defendant, therefore, contends that his statement provided to police after his arrest connecting him to the cocaine should have been suppressed as the fruit of the unlawful arrest, rendering his conviction unsustainable. In

response, the State initially contends that defendant failed to properly preserve this issue because he failed to raise it in his posttrial motion, and that we should decline to review it.

¶ 27    Defendant concedes that he failed to raise this claim in his posttrial motion but asserts, in pertinent part, that the forfeiture exception for constitutional issues that was recognized in *People v. Cregan*, 2014 IL 113600, ¶ 20, applies here because the denial of his motion to suppress raises a Fourth Amendment violation. We agree with defendant.

¶ 28    In *Cregan*, our supreme court determined that in the interests of judicial economy, constitutional issues that were properly raised at trial and may be raised later in a postconviction petition are not forfeited by a defendant's failure to raise them in a written posttrial motion. *Id.* ¶¶ 15-18. As applied here, where defendant asserted a violation of his constitutional right to be free from unreasonable searches and seizures in his pretrial motion to quash arrest and suppress evidence, we determine that the constitutional-issue exception applies (*id.* at ¶ 20). Therefore we will consider his claim that the trial court erred in denying his motion to quash arrest and suppress evidence based on a lack of probable cause to arrest.

¶ 29    We note that the State also argues that defendant has provided insufficient analysis of how the *Cregan* exception applies here. However, it is clear that when the matter proceeded to a stipulated bench trial it was with the understanding that defendant was preserving the arguments he made in his motion to quash and suppress. Therefore, defendant's claim of a fourth-amendment violation was properly raised at trial and would be cognizable in a proceeding under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). The Act provides that a prisoner may institute a proceeding under the Act if he or she alleges "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." *Id.* § 122-1(a)(1). Because the

matter could have been raised in a postconviction petition and, therefore, is subject to review under the constitutional-issue exception, we now address the merits of defendant's argument.

¶ 30    When reviewing the trial court's ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review. *People v. Carter*, 2021 IL 125954, ¶ 21. First, we afford great deference to the trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Timmsen*, 2016 IL 118181, ¶ 11. Second, we review *de novo* the trial court's ultimate legal ruling on whether the evidence should be suppressed. *Id*. Consequently, a reviewing court remains free to engage in its own assessment of the facts in relation to the issues presented. *Carter*, 2021 IL 125954, ¶ 21. Further, we may consider evidence presented at the defendant's trial in addition to the evidence presented during the suppression hearing. *Id.*

¶ 31    Defendant contends that he was under arrest before he made an inculpatory statement, when he was placed in handcuffs and transported from the site of the traffic stop to the toll plaza. The State counters that when Melzer took defendant to the toll plaza, defendant was not under arrest; rather, he was merely being "detained pending additional investigation."

¶ 32    "A person has been arrested when his freedom of movement has been restrained by means of physical force or a show of authority." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). In determining whether an arrest has occurred, we consider whether "'the circumstances are such that a reasonable person, innocent of any crime, would conclude that he was not free to leave.'" *People v. Lopez*, 229 Ill. 2d 322, 346 (2008) (quoting *In re D.G.*, 144 Ill. 2d 404, 409 (1991)).

¶ 33    To determine whether an arrest occurred in a particular case, courts consider the totality of the circumstances, including the following factors:

"(1) the time, place, length, mood and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether defendant was told he could refuse to accompany police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers." *People v. Jackson*, 348 Ill. App. 3d 719, 728-29 (2004).

¶ 34     In *Jackson*, police officers stopped the defendant, a robbery suspect, on the street, handcuffed him and transported him in a police car to a hotel for purposes of witness identification. *Id.* at 724, 728. There was no evidence that the officers asked the defendant to accompany them to the hotel, told him he was free to leave, or told him that he could refuse to accompany them. An officer testified that the defendant was arrested and in custody at that time. *Id.* at 728. Rejecting the State's argument that the circumstances constituted merely an investigatory detention, the appellate court held that the defendant was under arrest. *Id.* at 727, 729.

¶ 35     Similarly, here, the officers handcuffed defendant and transported him in a police vehicle to a toll plaza for questioning. There was no indication that the officers asked defendant to accompany them, told him he was free to leave, or told him that he could refuse to accompany them. Further, although Melzer testified that defendant was being "detained pending additional investigation," the record reveals that Melzer told dispatch that defendant was under arrest for "armed violence." Therefore, based on the totality of the circumstances, we hold that defendant was under arrest when he was handcuffed and transported to the toll plaza by Melzer.

¶ 36     The State cites *People v. Thompson*, 2020 IL App (1st) 170753, to support its argument. In that case the police handcuffed the defendant, placed him in an open-door police wagon, and told

him he was not under arrest; the "entire interaction lasted only several minutes." *Id.* ¶ 9. The appellate court held that the defendant was not under arrest at this time. *Id.* ¶ 36. However, here, Melzer stated to dispatch that defendant was under arrest and then he was transported to another location. Therefore, *Thompson* is distinguishable from this case.

¶ 37    Next, defendant argues he was arrested without probable cause and, therefore, the inculpatory statement he later provided to police should have been suppressed. The State argues that probable cause existed to arrest defendant based on the theory that he jointly possessed the cocaine found in Ruben's pocket.

¶ 38    A warrantless arrest is valid only if supported by probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. *Id.* The existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *Id.* Whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt. *Id.*

¶ 39    When contraband is discovered during a search, probable cause to arrest an individual exists only if he can be linked to the contraband. *People v. Drake*, 288 Ill. App. 963, 968 (1997). A person's mere proximity to others independently suspected of criminal activity does not, without more, give rise to probable cause to arrest that person. *People v. Garvin*, 219 Ill. 2d 104, 110 (2006). Where the standard is probable cause, a search or seizure of the person must be supported by probable cause particularized with respect to that person, and this requirement cannot be undercut or avoided simply by showing that there exists probable cause to search or seize another person who is nearby. *Ybarra v. Illinois*, 444 U.S. 84, 91 (1979).

¶ 40    Probable cause to believe that a defendant has committed a possession offense consists of evidence tending to show that the defendant knew of the presence of the contraband *and* that it was in his immediate and exclusive control. *People v. Juarbe*, 318 Ill. App. 3d 1040, 1053-54 (2001). Where two or more people share immediate and exclusive control of contraband, they jointly possess it. *Id.* at 1054. Additionally, where contraband is discovered during a search, probable cause to arrest exists if a defendant can be linked to such contraband via joint possession. *Drake*, 288 Ill. App. 3d at 968.

¶ 41    However, proximity to contraband is not sufficient to show possession. *People v. McIntyre*, 2011 IL App (2d) 100889, ¶ 17. In addition, the owner or driver of a vehicle is not *ipso facto* in possession of everything in the passenger area of the vehicle if there are also passengers who are in possession of the contraband. *Id.*

¶ 42    Here, the evidence presented at the hearing on the motion to quash and suppress reveals that the cocaine was found in Ruben's left pants pocket. Although defendant responded differently from Ruben to questions and acted nervously, the State presented no testimony from the officers linking defendant to the cocaine. At the time of the arrest there was no evidence that defendant had control, or the ability to exercise control, over the cocaine found in Ruben's pocket. Therefore, we conclude that the trial court erred when it ruled that police had probable cause to arrest defendant. For these reasons, no probable cause existed to arrest defendant, his motion to quash arrest and suppress evidence should have been granted, and his postarrest statements should have been suppressed.[1]

---

[1] The cocaine that was the basis of defendant's possession charge was properly seized upon a valid search incident to the arrest of Ruben for illegal possession of a firearm. *People v. Ruben Ruiz*, 2023 IL App (2d) 210001-U, ¶¶ 15, 28.

¶ 43    The State cites *People v. Givens*, 237 Ill. 2d 311 (2010), to support its argument that there was probable cause to arrest defendant on the theory of joint possession of the cocaine. In *Givens*, our Supreme Court noted that the arresting officers found the defendant and her boyfriend lying in a bed located in the sole bedroom of an apartment. *Id.* at 317. In plain view, the officers observed a clear plastic bag containing crack cocaine on top of a nightstand near the bed and within arm's reach of the couple. *Id.* The supreme court found the evidence established that the defendant had joint possession of the drugs, stating:

> "In [*People v. Schmalz*, 194 Ill. 2d 75 (2000)], the illegal drugs were within a short
> distance of defendant, while in the instant case, the drugs were on a nightstand within a
> short distance of the bed in which defendant was lying. A nightstand in a bedroom is a
> place where it could reasonably be expected that a couple staying as overnight guests would
> place their valuable personal items." *Id.* at 338.

In contrast to *Givens*, here, the cocaine was not found in a neutral spot, in plain view, where defendant had access to it. Rather, the cocaine was contained in Ruben's pocket. Therefore, *Givens* is distinguishable from this case.

¶ 44                                          B. Harmless Error

¶ 45    Having concluded that the arrest was unlawful, we next address whether it necessitates reversal and a new trial. Defendant urges us to reverse his conviction outright claiming that his statement to police is the only evidence that he had a possessory interest in the cocaine. The State argues we may affirm because the illegal arrest was "harmless beyond a reasonable doubt." That is, the State urges that the evidence derived from the arrest did not affect the trial court's decision to convict, given the additional evidence of guilt.

¶ 46    Harmless error review applies where a constitutional violation leads to erroneous admission of evidence. See *In re Brandon P.*, 2014 IL 116653, ¶¶ 48-50 (addressing erroneous

admission of child victim's statements in violation of confrontation clause); *People v. Patterson*, 217 Ill. 2d 407, 428 (2005) (addressing erroneous admission of grand jury testimony in violation of confrontation clause); *People v. Smith*, 2022 IL (1st) 190691, ¶¶ 100-108 (addressing erroneous admission of evidence after an unlawful arrest). "The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained at trial." *Brandon P.*, 2014 IL 116653, ¶ 50. "When determining whether an error is harmless, a reviewing court may, '(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.'" *Id.* (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)). "[O]n harmless error review, the question is not what the [fact-finder] could have done, but what 'the [fact-finder] *would have* done'" absent the improperly admitted evidence. (Emphasis in original.) *People v. Collins*, 2020 IL App (1st) 181746, ¶ 44 (quoting *People v. Parmly*, 117 Ill. 2d 386, 396 (1987)).

¶ 47    Here, the evidence derived from defendant's unlawful arrest consisted of defendant's statement to the officers that the cocaine belonged to him and that he handed it to Ruben during the traffic stop. Defendant argues that there was no other evidence to support his conviction. However, even without defendant's inculpatory statement, there was overwhelming evidence of defendant's guilt. At the stipulated bench trial of defendant and Ruben, the parties stipulated that Ruben told officers that he was holding the cocaine for defendant.

¶ 48    Here, defendant was charged with unlawful possession of a controlled substance (28 grams of cocaine) (720 ILCS 570/402(a)(2)(A) (West 2018)). *Id.* To prove defendant guilty of possessing a controlled substance, the State must prove defendant knowingly possessed a controlled substance. *Id.* Possession can be actual or constructive. *Givens*, 237 Ill. 2d at 335. Actual

possession may be proved by evidence that the defendant exercised some form of dominion over the unlawful substance, such as trying to conceal. *People v. Love*, 404 Ill. App. 3d 784, 788 (2010). Actual possession does not require present personal touching of the illicit material but, rather, present personal dominion over it. *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000). Constructive possession entails no actual personal present dominion, but there exists an intent and a capability to maintain control and dominion over the controlled substance. *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992).

¶ 49    Therefore, absent defendant's inculpatory statement, the stipulated evidence established defendant's guilt of unlawful possession of a controlled substance beyond a reasonable doubt. Defendant stipulated that Ruben told the officers he was holding the cocaine for defendant. A stipulation is conclusive as to all matters included in it, and no proof of stipulated facts is necessary because a stipulation is a substitution for proof that dispenses with the need for evidence. *People v. Woods*, 214 Ill. 2d 455, 469 (2005). "Generally speaking, a defendant is precluded from attacking or otherwise contradicting any facts to which he or she stipulated." *Id.* Therefore, the evidence proved that defendant exhibited an intent to continue to exercise dominion over the cocaine by attempting to conceal it by giving it to Ruben. Accordingly, we determine that even without defendant's admission that the cocaine belonged to him, the State produced sufficient evidence to convict him of possession of a controlled substance.

¶ 50    We are convinced that the trial court would have reached the same finding, even had it not heard evidence derived from the arrest. Under this record, we agree with the State that the admission of evidence resulting from defendant's arrest was harmless beyond a reasonable doubt. Accordingly, we will not disturb defendant's conviction.

¶ 51                                C. Jury Waiver

¶ 52    Next, defendant argues that he did not knowingly and voluntarily waive his right to a jury

trial because the trial court failed to adequately admonish him. The State contends and defendant concedes that the error is forfeited since defendant did not raise the issue in a posttrial motion.

¶ 53     Defendant contends that we should review the issue as plain error. Under Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), we review unpreserved plain errors affecting substantial rights in two limited circumstances: (1) when the evidence is closely balanced or (2) when the error was so serious that it denied the defendant a fair and impartial trial. *People v. Hutt*, 2023 IL 128170, ¶ 28. Whether a defendant's fundamental right to a jury trial has been violated is a matter that may be considered under the second prong of the plain error rule. *Id.*

¶ 54     The first step in our plain-error analysis is to determine whether any error occurred, meaning we must determine whether defendant's fundamental right to a jury trial was violated. *Id.* ¶ 29. Defendant argues that the trial court failed to properly admonish him to ensure that defendant knowingly, voluntarily, and intelligently waived his right to a jury trial. The State counters that there was no error since the record demonstrates that defendant knowingly and understandingly waived his right to a jury trial.

¶ 55     Our federal and state constitutions both guarantee a criminal defendant's right to a trial by jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. A defendant may waive this right by knowingly and understandingly waiving it in open court. 725 ILCS 5/103-6 (West 2020); *People v. Bracey*, 213 Ill. 2d 265, 269-70 (2004). There is no specific admonishment or advice the court must provide prior to accepting a waiver. *People v. Bannister*, 232 Ill. 2d 52, 66 (2008). The effectiveness of a defendant's waiver depends on the particular facts and circumstances of each case. *Id.* A written waiver is one way to show an intent to waive the jury right. 725 ILCS 5/115-1 (West 2020); *Bracey*, 213 Ill. 2d at 269. However, a written waiver, while recommended, does not always decisively establish a valid waiver. *Bracey*, 213 Ill. 2d at 269-70. The critical determination is whether the waiving defendant understood his case would be decided by a judge rather than a

jury. *Id.* at 69. On appeal, it is the burden of a defendant challenging the validity of a jury waiver to establish that the waiver was not understanding or voluntary. *People v. Parker*, 2016 IL App (1st) 141597, ¶ 47. Whether a defendant knowingly waived his right to a jury trial is subject to *de novo* review. *Bracey*, 213 Ill. 2d at 270.

¶ 56 Under the circumstances here, we hold that defendant knowingly and voluntarily waived his right to a jury trial. Before defendant's stipulated bench trial, the trial court informed defendant that, he "had a right to one of two types of trials, either a jury trial in front of 12 members of the community listening to all the evidence or a bench trial where I would listen to all the evidence." When the court asked defendant if he understood the difference between the two types of trials, defendant indicated that he understood. The court then asked defendant whether he spoke with his attorney about whether he wanted a jury or bench trial. Defendant replied that he had and that he chose a bench trial. In addition, defendant provided a signed written jury waiver to the court. At no point did defendant ask any questions about the jury waiver or otherwise indicate that he did not understand it. See *People v. Reed*, 2016 IL App (1st) 140498, ¶ 8 (responses to trial court's questioning and absence of any objection or questions from defendant evidenced a valid jury waiver).

¶ 57 In addition, the record establishes that defendant has a criminal history dating back to 2005, consisting of three misdemeanors and one felony dating back to 2011. Considering defendant's experience with the criminal justice system, his criminal record supports the conclusion that he understood his right to a jury trial and the consequences of waiving that right. *People v. Foster*, 2022 IL App (2d) 200098, ¶ 33.

¶ 58 Defendant argues that *People v. Tooles*, 177 Ill. 2d 462 (1997) requires a trial court to 1) explain the differences between a jury trial and a bench trial, 2) explain what a waiver means, 3) ensure the waiver is not the product of promises or threats, and 4) determine that the defendant

conferred with counsel about the jury waiver before signing it. Defendant's reliance on *Tooles* is misguided.

¶ 59 In *Tooles*, our supreme court reviewed the trial records in three separate cases to determine whether the defendants had each understandingly waived their right to a jury trial. *Id.* at 469-73. At every trial, the trial court spoke directly to each defendant. *Id.* at 469-72. The court asked defendant Tooles if he understood what a jury trial was and the court prompted him to explain that concept to the court, which he did. *Id.* at 469. Tooles was also asked if his jury waiver was the product of any promises or threats, and Tooles stated that it was not. *Id.* at 470. The court asked defendant Farmer if he understood that, by giving up a jury trial, his case would be heard by the judge sitting without a jury, and Farmer answered that he did. *Id.* Defendant Gray received an explanation of both a jury trial and a bench trial, and he acknowledged that he understood that, by waiving a jury, his case would proceed as a bench trial. *Id.* at 472.

¶ 60 Our supreme court concluded that all three defendants had understandingly waived their right to a jury trial under the circumstances, referencing the trial courts' admonitions in each case with approval. *Id.* at 470-73. However, the supreme court made clear that whether a jury waiver is made understandingly turns on the facts and circumstances of each case, reiterating the longstanding principle that "no set admonition or advice is required before an effective waiver of that right may be made." *Id.* at 469. Therefore, contrary to defendant's claim, *Tooles* sets forth no specific admonition that a trial court must give to render a defendant's jury waiver valid. *Foster*, 2022 IL App (2d) 200098, ¶ 35.

¶ 61                                     D. Sentencing

¶ 62 Defendant argues that in sentencing him the trial court improperly considered testimony that the amount of cocaine at issue was indicative of intent to deliver even though defendant was charged with mere possession.

¶ 63    Before considering this issue, we note that defendant concedes that he failed to raise this issue in his motion to reconsider sentence. Claims challenging a defendant's sentence that are not raised both at sentencing and in a postsentencing motion are forfeited. *People v. Johnson*, 2021 IL App. (2d) 180775, ¶ 12. Nevertheless, as defendant observes, we may review forfeited sentencing issues under the plain-error rule. To show plain error the defendant must establish that a clear or obvious error occurred at sentencing and either (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *People v. Stewart*, 2022 IL 126116, ¶ 13. Defendant argues that plain-error review is proper under the second prong. Initially, we must determine whether error occurred. *Id.* ¶ 12.

¶ 64    The nature of the offense is a proper governing factor in imposing a sentence. In this respect the court stated that defendant drove to Chicago "to pick up a large amount of cocaine bringing his brother with who's got a loaded gun. Nature of the offense, that's ugly." In drug-related cases the amount of a controlled substance is relevant to the nature and seriousness of the offense. *People v. Moffitt*, 138 Ill. App. 3d 106, 115 (1985). Further, Washburn's testimony regarding the amount of cocaine and its value was relevant because defendant was required to pay a fine based on the street value of the narcotics he possessed. 730 ILCS 5/5 ILCS-9-1.1 (West 2018). Accordingly, no error occurred.

¶ 65    Finally, defendant argues that his nine-year sentence was excessive given his largely nonviolent criminal history driven by his long history of drug use.

¶ 66    It is well established that the trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This is so because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. We may not substitute our judgment for that of the trial

court merely where we would have weighed the factors differently. Absent an abuse of discretion by the trial court, a sentence may not be altered on review. *Stacey*, 193 Ill. 2d at 210. A sentence that is within statutory limits will be deemed excessive and an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *Id.*

¶ 67    A sentence is excessive where it is within the statutory range but without regard for a particular defendant's rehabilitative potential. *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 71. "[I]t is presumed that the trial court properly considered all mitigating factors and rehabilitative potential before it, and the burden is on defendant to affirmatively show the contrary." *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 96. We do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently *People v. Alexander*, 239 Ill. 2d 205, 213 (2010).

¶ 68    In arriving at an appropriate sentence, the court may consider that a defendant possessed a quantity of drugs that exceeded the minimum for that sentencing range. *People v. Palmer-Smith*, 2015 IL App (4th) 130451, ¶ 29; *Moffitt*, 138 Ill. App. 3d at 115. We note that the trial court found that defendant possessed 28.9 grams of cocaine, nearly twice the minimum amount required for the offense. See 720 ILCS 570/402(a)(2)(A) (West 2018) (possession of 15 grams or more but less than 100 grams of cocaine). This is a class 1 felony subject to a sentencing range of 4 to 15 years of imprisonment. 730 ILCS 5/5-4.5-30(a) (West 2018). In addition, because this was defendant's second offense involving controlled substances, defendant was subject to an extended sentence of 4 to 30 years' imprisonment, or twice the maximum term. 720 ILCS 570/408(a) (West 2018). Here, the court imposed a nine-year sentence, to be served at 50%, which is within the statutory range and therefore presumed proper. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 1.

¶ 69    Nevertheless, defendant argues the nine-year sentence was not reflective of relevant

mitigating considerations, including his nonviolent background and his rehabilitative potential based on his decades-longs addiction to drugs. We disagree with defendant.

¶ 70 Despite defendant's contentions to the contrary, we determine that the sentence imposed was in keeping with the spirit and purpose of the law and find nothing in the record to rebut the presumption that the trial court properly considered all relevant mitigating and aggravating factors presented.

¶ 71 The court's pronouncements show it considered in mitigation that defendant's "criminal conduct neither caused nor threatened serious physical harm to another." The court also considered defendant's rehabilitative potential and weighed it against his past criminal history. Defendant had two prior felony drug convictions (possession of cocaine and possession of "THC"), two prior misdemeanor convictions (possession of "THC" and battery), and a conviction for driving while intoxicated. The court considered defense counsel's request for probation based on defendant's drug addiction and need for treatment. However, the court rejected this request explaining that defendant "just violated the Court's orders for pretrial monitoring and release by continuing to use [d]rugs," and was arrested for another felony drug offense while this case was pending.

¶ 72 Defendant merely disagrees with the weight the trial court accorded the relevant sentencing factors and asks this court to substitute our judgment for that of the trial court. This we cannot do. *Stacey*, 193 Ill. 2d 209. Moreover, the trial court does not need to give greater weight to any potential for rehabilitation than to the seriousness of the offense. *People v. Murray*, 2020 Il App (3d) 180759, ¶ 33. Here, the trial court properly struck a balance between rehabilitative potential and the seriousness of the offense. See *id.* Defendant's criminal history and presentence behavior strongly suggested that his potential for rehabilitation was not high. Further, nothing in the record demonstrates that the trial court improperly weighed these factors. Accordingly, we determine that the trial court did not abuse its discretion in sentencing defendant.

¶ 73                                III. CONCLUSION

¶ 74    The judgment of the circuit court of Boone County is affirmed.

¶ 75    Affirmed.